IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| LONA M. VARNER, and | ) | |
| LONNIE D. TINSLEY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. CIV-10-636-F |
| | ) | |
| CITY OF EL RENO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

---

# DEFENDANTS' BRIEF IN SUPPORT
# OF MOTION FOR SUMMARY JUDGMENT

---

David W. Lee, OBA # 5333
Emily B. Fagan, OBA # 22427

LEE LAW CENTER, P.C.
6011 N. Robinson Avenue
Oklahoma City, OK  73118-7425
(405) 848-1983/Fax: (405) 848-4978
Email address: leelawok@swbell.net

ATTORNEYS FOR DEFENDANTS

January 3, 2011

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS............................................... i-ii

LIST OF ATTACHMENTS............................................ iii-iv

TABLE OF AUTHORITIES............................................ v-ix

LCvR56.1(B) STATEMENT............................................ 1

ARGUMENT......................................................... 17

I.    THERE WAS NO EXCESSIVE USE OF FORCE WITH REGARD TO
      PLAINTIFF VARNER; THE USE OF THE TASERS IN THIS CASE WERE
      PROPER AND DID NOT VIOLATE ANY OF PLAINTIFF VARNER'S
      CLEARLY   ESTABLISHED   CONSTITUTIONAL   RIGHTS;
      FURTHERMORE, DEFENDANTS DURAN, TINGA AND SANDBERG
      ARE ENTITLED TO QUALIFIED IMMUNITY IN THIS REGARD......... 17

II.   THE SEIZURE OF PLAINTIFF VARNER AND PLAINTIFF TINSLEY
      WERE NOT VIOLATIONS OF THE FOURTH OR FOURTEENTH
      AMENDMENT; THERE WAS PROBABLE CAUSE TO SEIZE PLAINTIFF
      VARNER AND PLAINTIFF TINSLEY UNDER THE STATUTES OF THE
      STATE OF OKLAHOMA; FURTHERMORE, DEFENDANTS DURAN,
      TINGA AND SANDBERG ARE ENTITLED TO QUALIFIED IMMUNITY
      IN THIS REGARD................................................ 25

III.  THERE IS NO LIABILITY AGAINST THE CITY OF EL RENO IN THIS
      CASE;   THERE   WAS   NO   UNDERLYING   CONSTITUTIONAL
      VIOLATION BY ANY OF THE OFFICERS; FURTHERMORE, THE
      TRAINING OF THE OFFICERS WAS CERTAINLY CONSTITUTIONAL,
      AND THERE WAS NO UNCONSTITUTIONAL CUSTOM OR POLICY
      WITH REGARD TO ANY ALLEGED CONSTITUTIONAL VIOLATION,
      AND THERE WAS NO STATE LAW VIOLATION IN THIS CASE........ 36

IV.   THERE NO WAS GENUINE ISSUE OF MATERIAL FACT WITH
      REGARD  TO  ANY  ALLEGED  NEGLIGENT  INFLICTION  OF
      EMOTIONAL DISTRESS IN THIS CASE.............................. 38

i

V.     THE DEFENDANT OFFICERS DURAN, TINGA AND SANDBERG WERE
       ACTING WITHIN THE SCOPE OF THEIR EMPLOYMENT WITH THE
       CITY OF EL RENO; THEREFORE, THEY ARE IMMUNE FROM
       LIABILITY WITH REGARD TO ANY STATE LAW CLAIM. . . . . . . . . . . . 40

VI.    NO DEFENDANT COMMITTED ANY STATE LAW TORT OF
       DESTRUCTION OF PROPERTY OR OF FALSE ARREST AND
       IMPRISONMENT; AND IF THEY DID THE OFFICERS WERE IMMUNE
       UNDER STATE TORT LAW BECAUSE THEY WERE ACTING WITHIN
       THE SCOPE OF THEIR EMPLOYMENT... . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

VII.   DEFENDANTS REQUEST THE COURT TO DECLINE TO EXERCISE ITS
       SUPPLEMENTAL JURISDICTION OVER PLAINTIFF'S STATE COURT
       CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42-43

## <u>LIST OF ATTACHMENTS</u>

Attachment A - Sworn Declaration of Thomas Duran
      Exhibit 1 - CLEET Training Record
      Exhibit 2 - Certification from Taser International
      Exhibit 3 - Audio CD of radio transmissions on December 22, 2009 **(to be filed conventionally)**
      Exhibit 4 - Transcript of audio CD of radio transmissions on December 22, 2009
      Exhibit 5 - Peace Officer's Affidavit for Emergency Detention
      Exhibit 6 - Offense/Incident Report for Complaint No. 2009-3105
      Exhibit 7 - Use of Force Report
      Exhibit 8 - Photographs
      Exhibit 9 - Property Summary Report

Attachment B - Sworn Declaration of Frank Tinga
      Exhibit 1 - Advanced Law Enforcement Certificate from CLEET
      Exhibit 2 - CLEET Training Record
      Exhibit 3 - Certification from Taser International
      Exhibit 4 - Completion of Training Report
      Exhibit 5 - Certification for Field Training Officer from CLEET
      Exhibit 6 - Supplemental Narrative Report
      Exhibit 7 - El Reno Police Department Daily Observation Report

Attachment C - Sworn Declaration of Joseph S. Sandberg
      Exhibit 1 - CLEET Training Record
      Exhibit 2 - Certification from Taser Protect Life
      Exhibit 3 - Supplemental Narrative Report

Attachment D - Sworn Declaration of Jeremy Gore
      Exhibit 1 - Certification from Taser Protect Life

Attachment E - Sworn Declaration of Kendall W. Brown
      Exhibit 1 - CLEET Training Record
      Exhibit 2 - El Reno Police Department Use of Force Policy
      Exhibit 3 - Audio CD of 911 call from Parkview Home Health **(to be file conventionally)**
      Exhibit 4 - Transcript of audio CD of 911 call from Kendra of Parkview Home Health
      Exhibit 5 - Audio CD of 911 call from Lonnie Tinsley **(to be filed conventionally)**
      Exhibit 6 - Transcript of audio CD of 911 call from Lonnie Tinsley
      Exhibit 7 - Incident Notes from Central Aid Dispatch ("CAD") Program

Attachment F - Sworn Expert Report of Edward M. Cangiano

Attachment G - Selected Interrogatory Responses of Plaintiff Lonnie D. Tinsley

Attachment H- Selected Requests for Admission Responses of Plaintiff Lonnie D. Tinsley

Attachment I - EMS record

Attachment J - Parkview medical records and letter relating of Plaintiff Lona Varner

# TABLE OF AUTHORITIES

## CASES

Beck v. Phillips Colleges,
1994 OK CIV APP 84, 883 P.2d 1283. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Brooks v. City of Seattle,
599 F.3d 1018 (9th Cir. 2010),
rehg. granted, 623 F.3d 911 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

Brown v. City of Golden Valley,
574 F.3d 491 (8th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Bryan v. MacPherson,
___ F.3d ____, No. 08-55622, 2010 WL 4925422 (9th Cir. Nov. 30, 2010). . . . . . . 20, 21

Buchanan v. Sherrill,
51 F.3d 227 (10th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Byrd v. Hopson,
265 F. Supp. 2d 594 (W.D. N.C. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Casey v. Federal Heights,
509 F.3d 1278 (10th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Cavanaugh v. Woods Cross City,
625 F.3d 661 (10th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

City of Canton v. Harris,
489 U.S. 378, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989). . . . . . . . . . . . . . . . . . . . . 37

City of Los Angeles v. Heller,
475 U.S. 796, 106 S. Ct. 1571, 89 L. Ed. 2d 806 (1986). . . . . . . . . . . . . . . . . . . . . . 36

Clark v. Wilson,
625 F.3d 686 (10th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Conn v. Gabbert,
526 U.S. 286, 119 S. Ct. 1292, 143 L. Ed. 2d 399 (1999). . . . . . . . . . . . . . . . . . . . . 28

Cook v. City of Bella Villa,
582 F.3d 840 (8th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Cooper v. Millwood Independent School District No. 37,
1994 OK CIV APP 114, 887 P.2d 1370. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Daniels v. Williams,
474 U.S. 327, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986). . . . . . . . . . . . . . . . . . . 34, 35

Davidson v. Cannon,
474 U.S. 344, 106 S. Ct. 668, 88 L. Ed. 2d 677 (1986). . . . . . . . . . . . . . . . . . . . . 35

Doby v. DeCrescenzo,
171 F.3d 858 (3d Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Draper v. Reynolds,
369 F.3d 1270 (11th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Durruthy v. Pastor,
351 F.3d 1080 (11th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Edwards v. Giles,
51 F.3d 155 (8th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Forrest v. Prine,
620 F.3d 739 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Foster v. City of Lake Jackson,
28 F.3d 425 (5th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Graham v. Connor,
490 U.S. 386, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989). . . . . . . . . . . . . . . . . . 26, 30

Gross v. Pirtle,
245 F.3d 1151 (10th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Guillickson v. Southwest Airlines Pilots' Association,
87 F.3d 1176 (10th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Harper v. Lawrence County,
584 F.3d 1030 (11th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Henry v. Purnell,
619 F.3d 323 (4th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Hunter v. Namanny,
219 F.3d 825 (8th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Jackson v. City of Joliet,
715 F.2d 1200 (7th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Karr v. Smith,
774 F.2d 1029 (10th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

Kraszewski v. Baptist Med. Ctr. of Oklahoma, Inc.,
1996 OK 141, 916 P.2d 241.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Lockhart v. Loosen,
1997 OK 103, 943 P.2d 1074.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Maag v. Wessler,
960 F.2d 773 (9th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Marsh v. State,
1988 OK CR 206, 761 P.2d 915. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Mattos v. Agarano,
590 F.3d 1082 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Merrick v. Northern Natural Gas Co.,
911 F.2d 426 (10th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Monday v. Oullette,
118 F.3d 1099 (6th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Nolin v. Isbell,
207 F.3d 1253 (11th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

Pearson v. Callahan
555 U.S. 223, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). . . . . . . . . . . . . . . . . . . 18

Pena v. Leombruni,
200 F.3d 1031 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Porro v. Barnes,
624 F.3d 1322 (10th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Price v. Cochran,
205 F. Supp. 2d 1241 (D. Kan. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Purvis v. Oest,
614 F.3d 713 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Rodebush v. Oklahoma Nursing Homes, Ltd.,
1993 OK 160, 867 P.2d 1241.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Russo v. City of Cincinnati,
953 F.2d 1036 (6th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

Saucier v. Katz,
533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001).. . . . . . . . . . . . . . . . 26, 32

Starr v. Pearle Vision, Inc.,
54 F.3d 1548 (10th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Stearns v. Clarkson,
615 F.3d 1278 (10th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Swain v. Spinney,
117 F.3d 1 (1st Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Thomas v. Durastanti,
607 F.3d 655 (10th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Thompson v. City of Lawrence,
58 F.3d 1511 (10th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Thompson v. State Farm Fire and Casualty Co.,
34 F.3d 932 (10th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Totty v. Independent School Dist. No. I-009 of Blaine County, Okla.,
2008 WL 5070690 (W.D. Okla. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Trent v. State,
1989 OK CR 36, 777 P.2d 401. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Trigalet v. City of Tulsa,
239 F.3d 1150 (10th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Vondrake v. City of Las Cruces,
535 F.3d 1198 (10th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 32

Walker v. City of Orem,
451 F.3d 1139 (10th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Williams v. Bramer,
180 F.3d 699, clarified on reh'g,
186 F.3d 633 (5th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Zeran v. Diamond Broadcasting, Inc.,
203 F.3d 714 (10th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Ziegler v. Aukerman,
512 F.3d 777 (6th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## FEDERAL STATUTES

28 U.S.C. § 1367(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

42 U.S.C. § 1983. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

## OKLAHOMA STATUTES

Okla. Stat. tit. 21, § 540. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Okla. Stat. tit. 43A, § 1-103(13). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Okla. Stat. tit. 43A, § 5-207. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Okla. Stat. tit. 43A, § 5-208. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Okla. Stat. tit. 51 § 152.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41

Okla. Stat. tit. 51 § 153. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41

Okla. Stat. tit. 51 § 163(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 41

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

LONA M. VARNER, and )
LONNIE D. TINSLEY, )
                                                     )
                            Plaintiffs, )
                                                     )
vs.                                                 )          Case No. CIV-10-636-F
                                                     )
CITY OF EL RENO, et al., )
                                                     )
                            Defendants. )

**DEFENDANTS' BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

Defendants City of El Reno, Thomas Duran, Frank Tinga and Joseph Sandberg file

the following Brief in Support of Motion for Summary Judgment. Defendants Duran, Tinga

and Sandberg were officers on the scene, and when they are referred to collectively, they will

be referred to as "Defendant Officers."

**LOCAL RULE 56.1(B) STATEMENT**

1.       Defendant Thomas A. Duran is currently employed as a Police Officer with the

City of El Reno Police Department and has been employed there since September 2007.

Duran is a CLEET (Council on Law Enforcement Education and Training) certified officer.

On December 22, 2009, Duran had approximately 477 hours of CLEET training. Attached

as Exhibit 1 to Duran's Declaration is a copy of his CLEET Training Record. Duran has also

received training on the proper and safe use of the Taser X26 Electronic Control Device.

Duran was certified on the Taser X26 on January 21, 2009. Attached to Duran's Declaration

as Exhibit 2 is a copy of his Certification from Taser International. (Attach. A, Decl. of

Duran, ¶¶1-2).

2.     Defendant Frank E. Tinga is currently employed as a Police Officer with the City of El Reno Police Department and has been employed there since November 16, 2006. Tinga is a CLEET certified officer.  On June 30, 2010,  Tinga obtained his CLEET advanced certification.  See Exhibit 1, attached to Tinga's Declaration.  On December 22, 2009, Tinga had approximately 895 hours of CLEET training.  Attached to Tinga's Declaration as Exhibit 2 is a copy of his CLEET Training Record.  Tinga has also received training on the proper and safe use of the Taser X26 Electronic Control Device.  Tinga was initially certified on the Taser X26 on January 25, 2007.  Attached to Tinga's Declaration as Exhibit 3 is a copy of his Certification from Taser International.  Prior to the December 22, 2009 incident, Tinga obtained his Taser Re-Certification on January 28, 2009.  Attached as Exhibit 4 to Tinga's Declaration is a copy of the Completion of Training Report reflecting the January 28, 2009 Taser re-certification.(Attach. B, Decl. of Tinga, ¶¶ 1-2).

3.     Tinga is also a Field Training Officer.  Attached to Tinga's Declaration as Exhibit 5 is copy of his certification for Field Training Officer.  On December 22, 2009, Tinga was the Field Training Officer assigned to Officer Sandberg.  (Attach. B, Decl. of Tinga, ¶ 3).

4.     Defendant Joseph S. Sandberg is currently employed as a Police Officer with the City of El Reno Police Department and has been since July 6, 2009. Sandberg is a CLEET certified officer.  On December 22, 2009, Sandberg had approximately 584 hours of CLEET training.  Attached as Exhibit 1 to Sandberg's Declaration is a copy of his CLEET

2

Training Record.  Sandberg has also received training on the proper and safe use of the Taser

X26 Electronic Control Device.  Sandberg was certified on the Taser X26 on October 12,

2009.  Attached as Exhibit 2 to Sandberg's Declaration is a copy of his Certification from

Taser Protect Life. (Attach. C, Decl. of Sandberg, ¶¶ 1-2).

     5.     Attached to the Sworn Declaration of the City of El Reno Police Chief,

Kendall W. Brown, as Exhibit 3, is a copy of the 911 call made by a caller who identifies

herself as Kendra with Parkview Home Health.  This call was recorded by El Reno Police

Department Dispatch.  This call came in at approximately 18:32 on December 22, 2009.  The

Dispatcher was Melody Worthen (519).  Recordings of 911 calls are recorded in the normal

course of business by the El Reno Police Department and are a public record.  Brown has

reviewed the transcript of the recorded 911 call and believes it to be true and correct.  A copy

of the transcript of the recorded 911 call made by a person identifying herself as Kendra with

Parkview Home Health is attached to Brown's Sworn Declaration as Exhibit 4.  This call was

in reference to a Lona Varner with an address of 1955 S. Shepard, Apartment No. 703.

(Attach. E, Decl. of Brown, ¶ 8).

     6.     Melody Worthen was the call taker of the initial 911 call and was on the phone

with "Kendra of Parkview Home Health" when a second 911 call came in from a caller

identifying himself as Lonnie Tinsley.  This second call was taken by Kendra Wood Valarde.

Attached to Brown's Sworn Declaration, as Exhibit 5, is a copy of the 911 call made by the

caller who identified himself as Lonnie Tinsley.  This call was recorded by El Reno Police

Department Dispatch. This call came in at approximately 18:34.  The Dispatcher was Kendra

Wood Valarde. Recordings of 911 calls are recorded in the normal course of business by the El Reno Police Department and are a public record.  Brown has reviewed the transcript of the recorded 911 call and believes it to be true and correct.  A copy of the transcript of the recorded 911 call made by a person identifying himself as Lonnie Tinsley is attached to Brown's Sworn Declaration as Exhibit 6.  This call was also in reference to a Lona Varner. (Attach. E, Decl. of Brown, ¶ 9).

7.      Attached to Brown's Sworn Declaration, as Exhibit 7, is a copy of the call notes for this incident. These notes are automatically generated by the Central Aid Dispatch ("CAD") Program. Melody Worthen opened the CAD call and entered the information under the "Incident Notes" section. These notes are electronically stored and are kept in the regular course of business  by the El Reno Police Department and is a public record.  (Attach. E, Decl. of Brown, ¶ 10).

8.      On December 22, 2009, at approximately 1834 hours, Duran was dispatched to 1955 South Shepard, Apartment No. 703 in reference to a suicidal subject, who had taken unknown medication.  Duran was advised by dispatch that it was an overdose and that there was a relative in the apartment with the suicidal subject.  Duran reported to the location. Duran later learned that the suicidal subject was Lona Varner and the relative who had advised of the situation was Lonnie Tinsley, Ms. Varner's grandson.  Duran was not advised of the amount of medication or drugs that were taken by Ms. Varner; Duran was only advised that she was a suicidal subject who had taken an overdose of medication.  This led Duran to believe that Ms. Varner would need immediate medical attention; however, Duran would

need to clear the scene first to ensure that the medical providers were safe to enter the apartment.  (Attach. A, Decl. of Duran, ¶ 3).

9.    Duran has listened to and reviewed the recorded audio transmissions of this event and is familiar with the voices on the recording.  The recorded audio transmissions are true and correct and are attached to Duran's Sworn Declaration as Exhibit 3.  Duran has reviewed the transcript of the recorded audio transmissions and believes it to be true and correct.  A copy of the transcript of the recorded audio transmissions is attached to Duran's Sworn Declaration as Exhibit 4.  (Attach. A, Decl. of Duran, ¶ 4).

10.    Upon arrival to Apartment No. 703, Mr. Tinsley met Duran at the front door. Duran  noticed that Mr. Tinsley was worried that his grandmother, Ms. Varner, was trying to hurt or kill herself.  Duran  asked Mr. Tinsley where Ms. Varner was and Tinsley stated that she was inside.  Mr. Tinsley stated that he believed that Ms. Varner would not want Duran in there.  The front door to the apartment was open and Duran took a step inside. (Attach. A, Decl. of Duran, ¶ 5).

11.    As Duran  entered, he heard Ms. Varner state, "Get out of here. I don't want your help."  Duran looked around the corner and observed Ms. Varner lying on a bed in the living room area of the apartment.   Duran observed Ms. Varner reach for an object underneath her pillow while  stating, "Get the fuck out of here."  Since Duran did not know what was under the pillow, Duran backed up and bladed himself around the corner for cover. Duran observed Ms. Varner pull a kitchen knife from under the pillow and grasp it in a fashion commonly used to stab or slash.  Ms. Varner looked at Duran and stated, "I want to

die, I did not call you so get the fuck out of my house." (Attach. A, Decl. of Duran, ¶ 6).

12.     Since part of Duran's job is to protect life and it was very clear that Ms. Varner did not want to live and was adamant about dying, Duran tried to reason with her.   Duran noticed that Ms. Varner's actions surprised Mr. Tinsley, due to Mr. Tinsley saying, "I did not know she had that."  Mr. Tinsley tried to have Ms. Varner give him the knife but she would not listen to her own grandson, Mr. Tinsley.  Duran requested that he stay back from her, as it was a dangerous situation.  Duran asked Ms. Varner numerous times with a calm voice to just place the knife down.  Ms. Varner denied his requests and became more angry and aggressive.  Duran was very surprised at how angry and aggressive she was.  By the way Ms. Varner was holding herself and moving, Duran believed she had the physical capabilities to seriously harm someone with the deadly weapon that she possessed.  (Attach. A, Decl. of Duran, ¶ 7).

13.     Since Duran was the only officer on scene at this time, he requested another officer to help him control the scene, so that he could focus on Ms. Varner and not worry about Mr. Tinsley getting injured by his grandmother.  Mr. Tinsley kept attempting to approach Ms. Varner in order to get the knife.  Duran had to tell him numerous times to back away and not approach her.  This was due to safety concerns for both Mr. Tinsley and Ms. Varner, as it is not safe to allow a civilian to approach an armed subject, regardless of their relationship.  (Attach. A, Decl. of Duran, ¶ 8).

14.     Duran kept talking to Ms. Varner to try and calm her down, but nothing Duran said seemed to work.  Ms. Varner stated that if Duran tried to get the knife, she would stab

6

and kill Duran.  Ms. Varner further stated, that she "killed four japs in World War II and

[she] would not bat an eye killing [him]."  Duran took Ms. Varner's threats very seriously.

Duran was concerned for the safety of Mr. Tinsley, Ms. Varner and himself, so Duran

maintained his location and waited for additional officers to arrive.  (Attach. A, Decl. of

Duran, ¶ 9).

15.    On December 22, 2009, Officer Sandberg was in field training and his Field

Training Officer was Officer Tinga.  Officers Tinga and Sandberg had responded to a car

accident to which Officer Gore had also responded.  Sandberg remained at the accident scene

with Officer Gore while Officer Tinga left to run to a convenience store.  At approximately,

1840 hours, Sandberg heard Officer Duran request additional units regarding a call he was

on in which there was a suicidal subject armed with a knife.  Sandberg responded to this call

and rode in the patrol vehicle with Officer Gore to the residence.  Officer Tinga also heard

Duran's request for additional units and responded to Officer Duran's location.  (Attach. C,

Decl. of Sandberg, ¶ 3; Attach. D, Decl. of Gore, ¶3; Attach. B, Decl. of Tinga, ¶ 4).

16.    Upon arrival to Apartment No. 703, Tinga observed Officer Duran in the

doorway to the apartment.  Officer Duran was ordering a subject inside, Ms. Varner, to drop

the knife.  Tinga approached and looked inside the doorway.  Tinga saw Ms. Varner sitting

up in a bed wielding what appeared to be a steak knife in her right hand.  Ms. Varner was

holding the knife by the handle and was holding it in such a manner that would make it easy

for her to stab or thrust it into anyone that came within reach.  She was pointing the blade in

our direction.  Ms. Varner was pumping the knife forward and backward and was telling the

7

officers to get back or she would kill them. (Attach. B, Decl. of Tinga, ¶ 5).

17.     Tinga continued to order Ms. Varner to drop the knife while Tinga stepped past Officer Duran and into the apartment. Tinga asked Ms. Varner to drop the knife.  She stated, "Fuck you, you come any closer, I'll cut ya." Tinga stepped back towards the middle of the apartment.  (Attach. B, Decl. of Tinga, ¶ 6).

18.     Tinga noticed that a male was also in the residence, later learned to be Mr. Tinsley.  Mr. Tinsley, was pleading for the officers to do something and telling the officers that his grandmother was suicidal.  Mr. Tinsley also plead with Ms. Varner to drop the knife, but also continually told the officers not to touch her or hurt her.  Tinga explained to Mr. Tinsley that he needed to step back and allow the officers to gain control of the situation.  He refused.  (Attach. B, Decl. of Tinga, ¶ 7).

19.     Upon arrival at 1955 South Shepherd, Apartment No. 703, Sandberg entered the residence.  Sandberg observed an elderly white female, Ms. Varner, in a bed in the living room.  Sandberg observed that Ms. Varner was in an extremely agitated state.   Varner had a kitchen knife with a black handle and a pointed metal blade approximately six inches long. Ms. Varner was yelling at Office Tinga, who had arrived prior to Tinga's arrival. Ms. Varner was also swinging the knife around in an aggressI've manner.  Ms. Varner was stating that she would not go to the hospital.  Ms. Varner was making statements such as "Get the fuck out of my house" and "Get the fuck away from me" while waiving the knife.  Sandberg observed the knife raised up above her shoulder in her hand, as if she was ready to use the knife in a downward stabbing motion.  (Attach. C, Decl. of Sandberg, ¶ 4).

20.     Upon arrival, Officer Gore observed Officer Duran in the doorway to the apartment.  Gore observed Ms. Varner holding a knife and being belligerent.  Gore heard the officers directing Ms. Varner to drop the knife.  She did not comply with the request. (Attach. D, Decl. of Gore, ¶ 4).

21.     Once Officers Tinga, Gore and Sandberg arrived, Duran was able to focus his attention solely on Ms. Varner.  Ms. Varner again threatened the officers on scene verbally by threatening to use the knife on the them if the officers attempted to take it from her. Officers Sandberg and Tinga assisted Duran in trying to calm the situation and persuade Ms. Varner to put the knife down.  However, Ms. Varner took a more aggressive posture on the bed and raised the knife above her head and stated, "If you come any closer, you're getting the knife."  (Attach. A, Decl. of Duran, ¶ 10).

22.     Tinga continued to order Ms. Varner to drop the knife.  She continually refused to drop the weapon and instead proceeded to directly threaten the lives of the officers.  Tinga felt that if the officers were to get near her in an attempt to disarm her they would have been seriously injured by the edged weapon.  Tinga thought that Ms. Varner may also have been injured in the attempt to physically disarm her.  (Attach. B, Decl. of Tinga, ¶ 8).

23.     Also, upon entering the residence, Sandberg heard Lonnie Tinsley yell over and over again, "Don't you taze her!"  Sandberg saw Mr. Tinsley assaulting Officer Tinga by pushing and shoving Officer Tinga from the rear.  Officer Tinga could not reasonably face Mr. Tinsley while this was going on because Officer Tinga was facing Lona Varner, who had a knife in her hand.  Officer Tinga was keeping himself between Ms. Varner and Mr. Tinsley

and was protecting both himself and Mr. Tinsley by keeping both of them from the deadly threat.  (Attach. C, Decl. of Sandberg, ¶ 5).

24.     Officer Sandberg observed Officer Tinga continue to attempt to negotiate with Ms. Varner, but with no success.  Ms. Varner continued yelling at the officers that she would cut them and kill them.  It appeared that Ms. Varner was serious in her threats and would harm the officers if they were close enough.  The officers had exhausted attempts at verbally getting Ms. Varner to comply.  Officer Tinga told Officer Duran to "Taze her," as an attempt to disarm Ms. Varner, who was still brandishing the knife.  Officer Duran warned Ms. Varner to drop the knife or he would use his Taser.  Ms. Varner did not drop the knife.  Officer Duran drew and deployed his Taser.  (Attach. C, Decl. of Sandberg, ¶ 6; Attach. B, Decl. of Tinga, ¶9; Attach. A, Decl. of Duran, ¶11).

25.     Officer Tinga told Duran to deploy Duran's department issued Taser on Ms. Varner, as Tinga did not have a Taser with him.  Tinga felt this was the best option to disarm Ms. Varner, since she had refused the verbal commands to drop the knife.  Ms. Varner was in the process of standing up when Duran un-holstered his Taser.  This was a Taser X-26 model, which Duran had been trained on and certified to use.  When Duran deployed his Taser, one prong struck Ms. Varner but the other prong struck a blanket which had dropped down her leg.  Since both prongs did not strike Ms. Varner, the Taser was ineffective and did not affect Ms. Varner.  Both prongs must make contact in order to complete the circuit in order for the Taser to work and render the taseree incapable of movement for a short time period, three to five seconds.  (Attach. A, Decl. of Duran, ¶ 12; Attach. B, Decl. of Tinga,

10

¶¶ 9-10).

26.     When  Tinga looked at Officer Duran and told him to tase Ms. Varner, Mr. Tinsley, became aggravated and started pushing Tinga and telling Tinga not to tase her.  Mr. Tinsley was aggressive and Tinga told Tinsley to stay back.  Tinsley refused and continued to push against Tinga, in what Tinga perceived to be an effort to get by Tinga.  Tinga pushed Mr. Tinsley back and told him several times to stop his actions.  Tinsley continued to refuse Tinga's verbal commands and attempted to push against Tinga again.  Sandberg saw Tinsley began a full-force assault on Officer Tinga.  Officer Gore and Tinga pushed Tinsley back and took him to the ground.  (Attach. B, Decl. of Tinga, ¶ 10; Attach. C, Decl. of Sandberg, ¶ 7; Attach. D, Decl. of Gore, ¶ 5; Attach. A, Decl. of Duran, ¶ 15).

27..    Ms. Varner stared at Duran and continued to hold the knife up in an aggressive manner.  Duran told Officer Sandberg, who was standing to Duran's left, that his Taser was not effective.  Officer Sandberg then utilized his Taser, with both prongs making contact, which rendered Ms. Varner incapable of further aggressive action with the knife.  The use of the Taser was necessary due to Ms. Varner's refusal to comply with repeated orders to drop the knife and her continued verbal threats.  (Attach. A, Decl. of Duran, ¶ 13; Attach. C, Decl. of Sandberg, ¶ 8).

28.     Sandberg observed Ms. Varner's body lock up as expected.  The Taser cycled for its normal five seconds.  When the cycle completed, Ms. Varner looked right at Sandberg and said, "You mother fucker!" and she started to rise from the bed with the knife still in an above the shoulder ready to stab position.  Sandberg cycled the Taser again and Officer

11

Duran attempted to take the knife from Ms. Varner while she was under the effects of the

Taser.  Sandberg had to cycle the Taser once more while Officer Duran removed the knife

from Ms. Varner's hand and Officer Tinga assisted.  (Attach. C, Decl. of Sandberg, ¶ 9).

29.     Ms. Varner was disarmed by Duran and Officer Tinga.   While, Tinga was

attempting to handcuff Tinsley, he looked back at Ms. Varner.  Tinga observed that she was

still sitting up in bed holding the knife.  Tinga saw that she was tased and saw that she was

locked up.  Tinga let go of Tinsley as Officer Gore was able to control him.  Duran held Ms.

Varner's wrist, while Officer Tinga removed the knife from her grasp.  Tinga took the knife

from her and tossed it away from her.  Ms. Varner continued to yell and curse that she was

going to kill them.  While controlling Ms. Varner's arm, she received a laceration.  Duran

was later told by Parkview Hospital staff that this is a very common occurrence for elderly

subjects to receive bad lacerations with the slightest of contact with objects due to the thin

nature of their skin.  (Attach. A, Decl. of Duran, ¶ 14; Attach. B, Decl. of Tinga, ¶11).

30.     Officer Tinga turned back towards Mr. Tinsley and Officer Gore.  Gore still

had Mr. Tinsley on the floor, so Tinga went over to them and helped handcuff Mr. Tinsley.

Mr. Tinsley was struggling the entire time.  Mr. Tinsley was later walked out of the

apartment and sat in the rear seat of a patrol car. (Attach. B, Decl. of Tinga, ¶12; Attach. D,

Decl. of Gore, ¶ 6; Attach. A, Decl. of Duran, ¶15).

31.     Mr. Tinsley was walked out of the apartment and placed in the back of Officer

Gore's patrol vehicle.  Mr. Tinsley was detained due to his obstruction of police officers and

because he was assaulting an officer.  Mr. Tinsley remained in the patrol vehicle for a short

time and then he was released.  Officer Gore spoke with Mr. Tinsley about what had

occurred and explained why the officers took the actions that they did.  Mr. Tinsley thanked

Officer Gore and stated that he understood. Sandberg also explained to Mr. Tinsley why the

actions were necessary and Tinsley made short statements to Sandberg about how he

understood and was sorry for his actions. (Attach. D, Decl. of Gore, ¶ 7; Attach. C, Decl. of

Sandberg, ¶¶ 10-11).

32.    Mr. Tinsley did not appear injured in any way and the officers did not hear

Tinsley complain to anyone that he was injured.  Tinsley never asked for medical treatment.

(Attach. A, Decl. of Duran, ¶ 15 Attach. B, Decl. of Tinga, ¶ 13; Attach. D, Decl. of Gore,

¶ 10).

33.    Tinga handcuffed Ms. Varner and she was later treated by Parkview EMS.

(Attach. B, Decl. of Tinga, ¶ 13).

34.    After the knife was removed from Ms. Varner's control, the scene was

considered secure and Parkview EMS was allowed to come in.  Ms. Varner told Parkview

EMS that she was going to stab Duran if Duran had approached any closer to her.  Duran

took pictures of the scene and secured the knife as evidence.  Parkview EMS transported Ms.

Varner to Parkview Hospital in El Reno.  (Attach. A, Decl. of Duran, ¶ 16).

35.    After photographing the scene, Duran went to Parkview Hospital and took

pictures of the Taser impact makers, along with pictures of Ms. Varner's arm.  Parkview staff

removed the Taser prongs and Duran took custody of them for evidence purposes.  While at

the hospital, Parkview EMS told Duran that while transporting Mr. Varner, she continued to

13

make several statements about killing Duran and other police officers.  (Attach. A, Decl. of Duran, ¶ 17).

36.     While Duran was at Parkview Hospital, Ms. Varner made several statements about killing the police.  She told Duran that she was going to kill every officer that was in her apartment when she got out.   Ms. Varner further stated that she was going to snap Duran's neck like a twig, just like she did during World War II.  (Attach. A, Decl. of Duran, ¶ 18).

37.     Duran completed a Peace Officer's Affidavit for Emergency Detention.  Duran believed that Ms. Varner was an obvious threat to herself and to others due to her actions that night.  Duran's affidavit is attached to his Declaration as Exhibit 5.  Duran also completed an Offense/Incident Report for Complaint No. 2009-3105.  The Offense/Incident Report is attached to his Declaration as Exhibit 6.  (Attach. A, Decl. of Duran, ¶ 19).

38.     Due to the deployment of a Taser device, Duran completed a Use of Force Report.  That Report is attached to his Declaration as Exhibit 7.  (Attach. A, Decl. of Duran, ¶ 20).

39.     Duran had considered using his can of First Defense OC spray; however, due to the confined space and the longer lasting effects of OC spray, Duran did not believe it would be a good option in the situation.  (Attach. A, Decl. of Duran, ¶ 21).

40.     As is stated above in ¶¶ 33-34, Duran took photographs of the scene and of Ms. Varner.  Those photographs are attached to Duran's Sworn Declaration as Exhibit 8. The knife Ms. Varner was holding is depicted in the photographs that Duran took.  (Attach. A,

14

Decl. of Duran, ¶ 22).

41.     Duran also completed a Property Summary Report.  That report shows that black handled serrated kitchen knife was submitted to evidence.  That report is attached as Exhibit 9 to Duran's Declaration.  (Attach. A, Decl. of Duran, ¶ 23).

42.     Duran, Tinga, Sandberg and Gore did not use any excessive force against or upon Ms. Varner or Mr. Tinsley at any time during the incident on December 22, 2009.  They used only the force necessary to react to Ms. Varner's threatening words and actions and her refusal to comply with directions to drop the knife.  They used only the force necessary to control of Mr. Tinsley, as he was obstructing the officers' duties and was pushing and shoving Officer Tinga.  (Attach. A, Decl. of Duran, ¶¶ 1-24; Attach. B, Decl. of Tinga, ¶¶ 1-17; Attach. C, Decl. of Sandberg, ¶¶ 1-14; Attach. D, Decl. of Gore, ¶¶ 1-10; Attach. E, Decl. of Brown, ¶¶ 1-10; Attach. F, Sworn Expert Report of Edward Cangiano; Attachment G - Selected Interrogatory Responses of Plaintiff Lonnie D. Tinsley; Attachment H- Selected Requests for Admission Responses of Plaintiff Lonnie D. Tinsley; Attachment I - EMS record; Attachment J - Parkview medical records and letter relating of Plaintiff Lona Varner).

43.     Duran, Tinga, Sandberg and Gore did not unlawfully detain or seize either Plaintiff Varner or Plaintiff Tinsley at any time during the incident on December 22, 2009. (Attach. A, Decl. of Duran, ¶¶ 1-24; Attach. B, Decl. of Tinga, ¶¶ 1-17; Attach. C, Decl. of Sandberg, ¶¶ 1-14; Attach. D, Decl. of Gore, ¶¶ 1-10; Attach. E, Decl. of Brown, ¶¶ 1-10; Attach. F, Sworn Expert Report of Edward Cangiano; Attachment G - Selected Interrogatory Responses of Plaintiff Lonnie D. Tinsley; Attachment H- Selected Requests for Admission

Responses of Plaintiff Lonnie D. Tinsley; Attachment I - EMS record; Attachment J - Parkview medical records and letter relating of Plaintiff Lona Varner).

44.     None of the Defendants in this case did anything that constituted a state law tort, or false arrest or imprisonment or negligent or intentional infliction of emotional distress or destruction of property with regard to violated any of Plaintiff Varner or Plaintiff Tinsley. (Attach. A, Decl. of Duran, ¶¶ 1-24; Attach. B, Decl. of Tinga, ¶¶ 1-17; Attach. C, Decl. of Sandberg, ¶¶ 1-14; Attach. D, Decl. of Gore, ¶¶ 1-10; Attach. E, Decl. of Brown, ¶¶ 1-10; Attach. F, Sworn Expert Report of Edward Cangiano; Attachment G - Selected Interrogatory Responses of Plaintiff Lonnie D. Tinsley; Attachment H- Selected Requests for Admission Responses of Plaintiff Lonnie D. Tinsley; Attachment I - EMS record; Attachment J - Parkview medical records and letter relating of Plaintiff Lona Varner).

45.     None of the officers stepped on Ms. Varner's oxygen hose.  None of the officers engaged in any illegal or improper destruction of Ms. Varner's property.  (Attach. A, Decl. of Duran, ¶ 25; Attach. B, Decl. of Tinga, ¶ 16);  Attach. C, Decl. of Sandberg, ¶¶ 13 & 14).

46.      All of the officers who were at the scene were properly trained by the City of El Reno with regard to all aspects of the events involving Plaintiffs on December 22, 2009. (Attach. A, Decl. of Duran, ¶¶ 1-24; Attach. B, Decl. of Tinga, ¶¶ 1-17; Attach. C, Decl. of Sandberg, ¶¶ 1-14; Attach. D, Decl. of Gore, ¶¶ 1-10; Attach. E, Decl. of Brown, ¶¶ 1-10; Attach. F, Sworn Expert Report of Edward Cangiano; Attachment G - Selected Interrogatory Responses of Plaintiff Lonnie D. Tinsley; Attachment H- Selected Requests for Admission

Responses of Plaintiff Lonnie D. Tinsley; Attachment I - EMS record; Attachment J - Parkview medical records and letter relating of Plaintiff Lona Varner).

47.     There were no unconstitutional policies of the City of El Reno that were the cause of any alleged constitutional or state law claims by Plaintiffs in this case.  (Attach. A, Decl. of Duran, ¶¶ 1-24; Attach. B, Decl. of Tinga, ¶¶ 1-17; Attach. C, Decl. of Sandberg, ¶¶ 1-14; Attach. D, Decl. of Gore, ¶¶ 1-10; Attach. E, Decl. of Brown, ¶¶ 1-10; Attach. F, Sworn Expert Report of Edward Cangiano; Attachment G - Selected Interrogatory Responses of Plaintiff Lonnie D. Tinsley; Attachment H- Selected Requests for Admission Responses of Plaintiff Lonnie D. Tinsley; Attachment I - EMS record; Attachment J - Parkview medical records and letter relating of Plaintiff Lona Varner).

## **ARGUMENT**

I.     **THERE WAS NO EXCESSIVE USE OF FORCE WITH REGARD TO PLAINTIFF VARNER; THE USE OF THE TASERS IN THIS CASE WERE PROPER AND DID NOT VIOLATE ANY OF PLAINTIFF VARNER'S CLEARLY ESTABLISHED CONSTITUTIONAL RIGHTS; FURTHERMORE, DEFENDANTS DURAN, TINGA AND SANDBERG ARE ENTITLED TO QUALIFIED IMMUNITY IN THIS REGARD.**

In her Complaint, Plaintiff Varner in her First Cause of Action (¶¶ 1-26) alleges that Defendants violated her rights under the Fourth and Fourteenth Amendments by the use of a taser, and by alleged wrongful arrest, seizure, and detention.  However the LCvR56.1(b) Statement, and the authorities set forth in this Brief, show that there was no constitutional violation with regard to any Defendants' actions involving Plaintiff Varner.

Defendant Officers did not violate any clearly established rights of Plaintiff Varner.

17

In <u>Pearson v. Callahan</u> 555 U.S. 223, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009), the Court stated that "[t]he protections of qualified immunity applies regardless of whether the government's error is a 'mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'"  Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law.  <u>Thomas v. Durastanti</u>, 607 F.3d 655, 661 n.4 (10th Cir. 2010).  The court in <u>Thomas</u>  noted that a "close call" favors a successful qualified immunity defense.  <u>Id.</u>  Although qualified immunity is an affirmative defense, it becomes the plaintiff's burden to defeat it.  <u>Purvis v. Oest</u>, 614 F.3d 713, 717 (7th Cir. 2010). "Abrogation of qualified immunity is properly the exception, not the rule." <u>Foster v. City of Lake Jackson</u>, 28 F.3d 425, 428 (5th Cir. 1994).

Qualified immunity ensures that officers are accorded "'a fairly wide zone of protection.'"  <u>Swain v. Spinney</u>, 117 F.3d 1, 10 (1st Cir. 1997).  Police officers are protected in "close cases" by the doctrine of qualified immunity, and that immunity serves to protect law enforcement officers from the chilling threat of liability.  <u>Id.</u>  <u>See also</u> <u>Henry v. Purnell</u>, 619 F.3d 323, 333 n.7 (4th Cir. 2010) (stating that to determine whether a police officer's mistaken use of deadly force is objectively reasonable, the court of appeals filters the objective facts through the lens of the officer's perceptions at the time of the incident in question, focusing on what the police officer reasonable perceived).  In <u>Henry</u>, the court held that  a unintentional, accidental shooting of the arrestee did not violate the Fourth Amendment right to be free from seizure effectuated by excessive force, and therefore, the deputy was entitled to qualified immunity, absent evidence that the deputy acted

18

unreasonably by intending to use a taser to apprehend the arrestee, since the deputy did not have fair notice that the mistake of weapon confusion contravened clearly established law. Id. at 334-35.

In the present case, the tasering, seizure and detention of Plaintiff Varner were constitutional, and did not violate any of her clearly established constitutional rights. The taser is an accepted and important tool in law enforcement. Attach. F, Sworn Expert Report of Edward M. Cangiano, at 7-10. Cangiano holds a Master Instructor Certification with the Taser International Training Academy, as his certificate demonstrates. Attach. F. All officers sued in this case were certified by Taser International as being trained in the proper and safe use of the Taser X26, the taser that was employed in this case. LRCv56.1(b) Statement, ¶¶ 1-4; Attach. E, Decl. of Chief Brown; Attach. F, Sworn Expert Report of Cangiano.

In his Expert Report, Cangiano also points out that the officers, in their contact with Plaintiff Varner, used the City's Use of Force Policy, and started with Level 1, then went to Level 2, then to Level 3, which is a level of physical force justified to subdue a person who is threatening, resisting arrest, or physically interfering with an arrest or to prevent the possibility of injury to any person. Attach. F, at 7. Plaintiff Varner's conduct clearly met the Level 3 criteria, and her tasering was justified.

In the present case, Defendant Officers' actions did not violate any clearly established

19

law regarding the use of tasers.[1]  In Cook v. City of Bella Villa, 582 F.3d 840, 849 (8th Cir.

2009), the court held that the conduct of the police officer, in tasering and causing the

arrestee's head to strike a vehicle, was objectively reasonable. This was where the officer

was alone and outnumbered by presumably intoxicated suspects on a state highway at

midnight, the driver was expressing sarcastic comments and was noncompliant, and the

arrestee had been hysterically shouting at the officer and exhibited wayward behavior in

exiting the vehicle and taking a step toward the officer to oppose the officer's arrest or

search.  Id.  The court in Cook held that minor scrapes and two laser puncture marks that did

not require medical attention were relevant in measuring the reasonableness of the force used

by the officer during the course of the arrest.  Id. at 849-50.  The court stated that the lack,

or minor degree, of any injuries sustained during an arrest is relevant in considering the

reasonableness of the force used.  Id. at 850-51.

Recently the Ninth Circuit, in Bryan v. MacPherson, ___ F.3d ____, No. 08-55622,

2010 WL 4925422 (9th Cir. Nov. 30, 2010), withdrew its June 18, 2010 opinion, reported

at 608 F.3d 614 and directed the clerk to file a superseding opinion.  The June 18, 2010

opinion had withdrawn  the Ninth Circuit's December 28, 2009 first opinion in the case,

reported at 590 F.3d 767.  In its November 30, 2010 opinion, the court held that while the

---

[1]In Brooks v. City of Seattle, 599 F.3d 1018 (9th Cir. 2010), rehg. granted, 623 F.3d
911 (9th Cir. 2010), the Ninth Circuit held that the officers in this case were entitled to
qualified immunity where the pregnant plaintiff alleged excessive force when the officers
tased her three times, in drive-stun mode, to effectuate her arrest after she was stopped for
speeding in a school zone.  However, in granting rehearing the Order of the Ninth Circuit
stated that "[t]he three-judge panel opinion shall not be cited as precedent by or to any court
of the Ninth  Circuit."  Id.

facts of that particular case led to the conclusion that Officer MacPherson's use of the taser was unconstitutionally excessive, he was entitled to qualified immunity.  Id. at *13.  In Bryan, the plaintiff had been stopped for a seat belt infraction, where the taseree, clad only in boxer shorts and tennis shoes, was agitated and shouting gibberish but was not threatening the officer or attempting to flee.  The taseree was unarmed.  The officer deployed his taser and the taseree fell face first into the ground.  The court found that the taseree did not level a physical or verbal threat against the officer.  In Bryan, the court held that the government's interest in the use of force was insufficient to justify the use of a taser.  Id.  However, the court recognized that the law was not clearly established.  The court summed this developing area of law up as follows:

> And, as the Eight Circuit has noted, "[t]he Taser is a relatively new implement of force, and case law related to the Taser is developing"  Brown v. City of Golden Valley, 574 F.3d 491, 498 n.5 (8th Cir. 2009).  Two other panels have recently, in cases involving different circumstances, concluded that the law regarding tasers is not sufficiently clearly established to warrant denying officers qualified immunity.  Mattos v. Agarano, 590 F.3d 1082, 1089-90 (9th Cir. 2010); Brooks v. City of Seattle, 599 F.3d 1018, 1031 n. 18 (9th Cir. 2010).

Id. at 23.  The court in Bryan further recognized that "[t]he ability to defuse a dangerous situation from a distance can obviate the need for more severe, or even deadly, force and thus can help protect police officers, bystanders, and suspects alike."  Id. at *16.

In Draper v. Reynolds, 369 F.3d 1270, 1277-78 (11th Cir. 2004), the court noted that the right to make an arrest necessarily carries with it the right to use some degree of physical coercion or threat to effect it. The court held that the deputy's use of a taser gun to arrest the

21

motorist was reasonably proportionate to the difficult, tense, and uncertain situation that the deputy faced in the traffic stop.  Id. at 1277-78.  The evidence showed that from the time the motorist met the deputy at the back of the truck, the motorist was hostile, belligerent, and uncooperative.  The deputy asked the motorist no less than five times to retrieve documents from the truck cab, and each time the motorist failed to comply and accused the deputy of harassing him and blinding him with the flashlight. The motorist also used profanity, moved around and paced in agitation, repeatedly yelling at the deputy. In this case, the single use of the taser gun causing a one-time shocking was reasonably proportionate to the need for force and did not inflict any serious injury.  Id. at 1278.

In Russo v. City of Cincinnati, 953 F.2d 1036 (6th Cir. 1992), the court held that officers, who deployed their taser at a potentially homicidal and suicidal paranoid schizophrenic person (Bubenhofer, the decedent) who lay at the bottom of the stairwell and posed no immediate threat to officers, were entitled to qualified immunity.  After being told by his sister that the schizophrenic man did not have a gun, the officers asked Bubenhofer to open the door, and he replied that he wanted to be left alone and would kill anyone who entered.  Id. at 1040.  Bubenhofer then opened the door and had a knife in each hand with the blades pointed towards the officers.  The officers stated that Bubenhofer threatened to take his own life.  Bubenhofer was holding the knives and an officer fired a taser dart multiple times.  Bubenhofer charged the officers and two officers fired their firearms at him and he fell to the bottom of the stairwell, still holding a knife.  Id.  The officers asked Bubenhofer to drop the knife; however, he got up and an officer fired another taser dart at

22

him.  Bubenhofer shook off the effects and another taser dart was fired.  Officers state that Bubenhofer charged at them, knife in hand, and they fired their firearms, resulting in Bubenhofer's death.  Id. at 1041.

The court in Russo held that the officer was also entitled to qualified immunity as to his initial and subsequent use of the taser.  Id. at 1044-45.  However, the officers were not entitled to qualified immunity regarding the use of deadly force involved in the multiple discharges of their firearms.  Id. at 1045.

Whether an officer's actions are objectively reasonable in light of stipulated facts is a pure question of law in § 1983 proceedings.  Cavanaugh v. Woods Cross City, 625 F.3d 661, 664 (10th Cir. 2010).  The present case differs greatly from the facts of Cavanaugh, a recent taser case.  In Cavanaugh, the court held that the officer's use of a stun gun on a woman was objectively unreasonable, and therefore, the officer was not entitled to qualified immunity in this § 1983 action involving the alleged use of excessive force in violation of the Fourth Amendment.  Id. at 665.  In Cavanaugh, the officer had responded to a non-emergency request for help from the woman's husband in finding the woman after a domestic dispute, the officer was investigating a non-injurious assault, the woman was headed toward her door when the officer used his stun gun on her, the woman did not act aggressively toward the officer or threaten him, the woman did not have any weapon, the officer did not give the woman any warning, and there was only a single bystander who was in his driveway next door, and the woman was not fleeing or resisting arrest.  Id.

In Cavanaugh, the court held that it was clearly established law that a police officer

could not use his stun gun on a nonviolent misdemeanant who did not pose a threat and was not resisting or evading arrest without first giving a warning.  Id. at 666-67.  See also Casey v. Federal Heights, 509 F.3d 1278, 1285-86 (10th Cir. 2008) (holding that the law was clearly established that it was not reasonable for the officer to use a taser immediately upon arriving at the scene of a struggle between another officer and a misdemeanant who was not fighting back).

In the present case, however, it is clear and uncontroverted that Plaintiff Varner was warned by the officers prior to the deployment of the taser.  LCvR56.1(b) Statement, ¶ 24.  Furthermore, the use of the taser, and the other actions of Defendant Officers Duran, Tinga and Sandberg, were objectively reasonable for other reasons.  These officers were responding to a situation where two 911 calls had been made about Varner's suicidal behavior (she had told her caretaker that she had taken 12 pills and was going to kill herself),[2] and upon arrival, officers found Varner was behaving in a suicidal manner, threatening to kill herself, and was brandishing a knife and threatening harm with it to the officers.

Defendants Duran, Tinga and Sandberg are entitled to qualified immunity with regard to all actions they took in this case, and did not violated clearly established constitutional law by the deployment of the taser upon Plaintiff Varner.  Furthermore, Officer Tinga did not

_____

[2]In Attach. E, Exhibits 3 and 5, the Declaration of Chief Brown, the audio recordings demonstrate the 911 calls:  first a 911 call from Kendra, of Parkview Home Health, whom Plaintiff Varner was a patient of, called stating that "I have a patient saying she's going to kill herself.  She told me she took 12 pills."  Next, Plaintiff Tinsley made a 911 call, stating that he needed an ambulance "or something" to check his grandmother, and that "[S]he's said she's . . . her life is over.  She wants to end it and she's taking some medicine-I don't know what she's taking."  Attach. E, Exhibits 4 and 6.

deploy his taser.  The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  Clark v. Wilson, 625 F.3d 686, 690 (10th Cir. 2010).  Ordinarily, in order for the law to be clearly established, for qualified immunity purposes, there must be a Supreme Court or court of appeals decision on point, or the clearly established weight of the authority from other courts must have found the law to be as the plaintiff maintains.  Id. at 690.

In Clark, F.3d at 691-92, the court held that a state prisoner did not have a clearly established right to a predeprivation hearing before a prison official froze his prison trust account in response to a summons in a garnishment action, and therefore the official was entitled to qualified immunity from the prisoner's § 1983 suit asserting a procedural due process claim.  At the time the official froze the account no Supreme Court decision on point or clearly established authority from the courts of appeals had addressed the question of whether freezing a prison account in response to a garnishment summons imposed an atypical and significant hardship on an inmate in relation to the ordinary incidents of prison life.  Id.

II.   **THE SEIZURE OF PLAINTIFF VARNER AND PLAINTIFF TINSLEY WERE NOT VIOLATIONS OF THE FOURTH OR FOURTEENTH AMENDMENT; THERE WAS PROBABLE CAUSE TO SEIZE PLAINTIFF VARNER AND PLAINTIFF TINSLEY UNDER THE  STATUTES OF THE STATE OF OKLAHOMA; FURTHERMORE, DEFENDANTS DURAN, TINGA AND SANDBERG ARE ENTITLED TO QUALIFIED IMMUNITY IN THIS REGARD.**

With regard to Plaintiffs' allegations that their Fourteenth Amendment rights were

violated (Complaint, ¶¶ 2-3), first it should be noted that claims alleging the use of unlawful force are governed by the Fourth Amendment, not the Fourteenth Amendment.  In a similar case, <u>Graham v. Connor</u>, 490 U.S. 386, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989), the Supreme Court held that all claims that law enforcement officers used excessive force, whether deadly or not, in the course of an arrest, an investigatory stop, or other seizure, should be analyzed under the Fourth Amendment and its reasonableness standard rather than under a substantive due process approach.  <u>See also</u> <u>Saucier v. Katz</u>, 533 U.S. 194, 205, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001) (Supreme Court reiterates that "claims of excessive force in the context of arrests or investigatory stops should be analyzed under the Fourth Amendment's 'objective reasonableness standard,' not under substantive due process principles.").

Despite what is alleged in the Complaint in the First Cause of Action, there was no Fourth Amendment violation or wrongful arrest or detention of either Plaintiff Varner or Plaintiff Tinsley.  With regard to the detention of Plaintiff Varner, under Okla. Stat. tit. 43A, § 1-103(13); Okla. Stat. tit. 43A, § 5-207; and Okla. Stat. tit. 43A, § 5-208, Defendant Officers properly took Plaintiff Varner into custody pursuant to those Oklahoma statutory emergency order of detention statutes.  There was probable cause to detain and seize Varner pursuant to those statutes.  Therefore, the actions of the officers were constitutional.  Furthermore, they violated no clearly established rights of Varner in this regard, and are entitled to qualified immunity as well.

Absent suspected criminal activity, under the Fourth Amendment, a law enforcement

official may not physically restrain an individual merely to assess his or her mental health. Ziegler v. Aukerman, 512 F.3d 777, 783 (6th Cir. 2008). However, the court in Ziegler stated that a showing of probable cause in the mental health seizure context requires only a probability or a substantial chance of dangerous behavior, not an actual showing of such behavior. Id.

The court in Ziegler held that exigent circumstances justified the police officer's warrantless entry onto a driveway connected to the mental health detainee's home and, therefore, the entry was reasonable under the Fourth Amendment. Id. at 785-86. In Ziegler, the officer had received a call from the emergency dispatcher stating that hospital staff had reported that the detainee was suicidal, and that there was a clinical certificate requiring that she be returned to the hospital. Id.

In the present case, there is no question that the entry into Plaintiff Varner's residence (an issue which has not been raised by the Plaintiffs), and the seizure of her, were completely warranted. The LCvR56.1(b) Statement shows that the officers had information through two 911 dispatch calls that Varner had ingested a large volume of pills, was threatening to kill herself.[3] In his responses to Defendants First Requests for Admissions, Nos. 1-2; 5, Tinsley

---

[3] The collective knowledge of the police can be used in determining probable cause. In Karr v. Smith, 774 F.2d 1029, 1031 (10th Cir. 1985), the court noted that under the "fellow officer rule," the court determines probable cause based on "the collective information of the police involved in the arrest, rather than exclusively on the extent of the knowledge of the particular officer who may actually make the arrest." In Stearns v. Clarkson, 615 F.3d 1278, 1286 (10th Cir. 2010), the court stated that "[w]hen one officer requests that another officer assist in executing an arrest, the assisting officer is not required to second-guess the requesting officer's probable cause determination, nor is he required to independently determine that probable cause exists." The court in Stearns noted that because

admits that he made a 911 call, stating that Varner said her life was over and wanted to end it. Attach. H.

When the officers arrived in response to the suicide call, Plaintiff Varner, who her caretaker and grandson had called 911 reporting that Varner was going to kill herself, was welding a knife and then threatened to kill herself and the officers. The officers properly intervened in order to effectuate an emergency order of detention authorized under the above Oklahoma statutes, and this seizure of Varner was with probable cause and was necessary to preserve a real threat to Varner's life. Significantly, Varner survived; the officers probably did save her life, or prevented serious injury to her.

In ¶ 23 of the Complaint, Tinsley alleges that the alleged "physical abuse" of his grandmother caused him negligent infliction of emotional distress. The LCvR56.1(b) Statement shows there was no physical abuse of Varner and there was no negligence by any officer. And Tinsley has no standing to complain of anything that happened to Varner. See Conn v. Gabbert, 526 U.S. 286, 292, 119 S. Ct. 1292, 143 L. Ed. 2d 399 (1999) (lawyer had no standing to complain of denial of right to counsel of client).

In the mental health context, a showing of probable cause requires proof only of a probability or substantial chance of dangerous behavior, not an actual showing of such behavior. Monday v. Oullette, 118 F.3d 1099, 1102 (6th Cir. 1997). Thus, a seizure and

---

the deputy reasonably relied on the other officers' probable cause determination, it did not address the collective information "fellow officer" rule of Karr. Stearns, 615 F.3d at 1286 n.5. See also Price v. Cochran, 205 F. Supp. 2d 1241, 1248-49 (D. Kan. 2003) (citing Karr "fellow officer" rule).

detention for psychiatric evaluation requires probable cause to believe that the person seized is dangerous to himself or to others. Id. Furthermore, a mental health seizure can rest upon probable cause even if the person seized does not actually suffer from a dangerous mental condition. Id. See also Maag v. Wessler, 960 F.2d 773, 775 (9th Cir. 1991) (although mental health confinement is governed by the Fourteenth Amendment's Due Process Clause, the seizure of a person for mental health reasons is governed by the Fourth Amendment's right to be free from unreasonable seizures).

In Pena v. Leombruni, 200 F.3d 1031 (10th Cir. 1999), the court upheld a district court's grant of summary judgment, holding that a sheriff's failure to instruct police on the handling of dangerous people who appeared to be irrational did not amount to deliberate indifference as would support a § 1983 claim. The sheriff's department instructed its deputies not to use deadly force unless they are in imminent danger of death or great bodily harm. The court held that failure to adopt those measures would not be more than mere negligence, which is not actionable under § 1983. Id. at 1033.

With regard to the seizure of Plaintiff Tinsley, his detention was justified due to his interference with the officers' detention and tasering of Plaintiff Varner. Tinsley clearly violated Okla. Stat. tit. 21, § 540 by interfering with the officers. See Trent v. State, 1989 OK CR 36, 777 P.2d 401 (passenger in vehicle repeatedly frustrated officer's efforts to remove the vehicle from the road constituted violation of Okla. Stat. tit. 21, § 540); Marsh v. State, 1988 OK CR 206, 761 P.2d 915 (obstructing under Okla. Stat. tit. 21, § 540 does not require physical force).

29

Certainly there was arguable probable cause to seize and/or arrest Tinsley, and the officers in the present case are entitled to qualified immunity.  In <u>Vondrake v. City of Las Cruces</u>, 535 F.3d 1198, 1206 (10th Cir. 2008), the court held that even in the absence of individualized suspicion, a brief seizure at a sobriety checkpoint may be reasonable if it is conducted in a neutral manner for the purpose of effectuating important governmental purposes.  In <u>Vondrake</u>, the court stated that in the context of § 1983, an officer is entitled to qualified immunity if a reasonable officer could have believed that reasonable suspicion existed to detain the plaintiff, in other words, if the officer had arguable reasonable suspicion. <u>Id.</u>  In <u>Vondrake</u>, the driver's statement that he "had one beer three hours ago" provided a police officer with arguable reasonable suspicion to conduct a field sobriety test, which entitled the officer to qualified immunity from liability under § 1983 on the driver's false arrest claim.  <u>Id.</u>

Also, there was no excessive force against Plaintiff Tinsley by the Defendant officers in violation of the Fourth Amendment, and the officers are entitled to qualified immunity in this respect as well.  In the present case, the circumstances were certainly "tense, uncertain, and rapidly evolving."  <u>Graham v. Connor</u>, 490 U.S. 386, 396-97, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989).  The Court in <u>Graham</u> noted that the reasonableness of a law enforcement officer's use of force is evaluated "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  <u>Id.</u> at 396.  The reasonableness inquiry requires "attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate theat to the safety

of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396. In the present case, any alleged force used to subdue Tinsley was fully justified, and was in the context of a situation that was tense, uncertain and rapidly evolving, especially since Tinsley was interfering with officers who were dealing with an individual who was armed with a knife, and whose life they were trying to save.

Furthermore, the nature of the force used on Tinsley was de minimis and therefore, not actionable under 42 U.S.C. § 1983. See Thompson v. City of Lawrence, 58 F.3d 1511, 1516-17 (10th Cir. 1995) (officers entitled to qualified immunity with regard to allegation that they shoved plaintiff to floor, drew a weapon on her, and handcuffed her, when, given the volatility of the situation, they acted with objective reasonableness); Hunter v. Namanny, 219 F.3d 825, 831-32 (8th Cir. 2000) (holding that the officer's actions, during the search of a home for drugs, of handcuffing the resident and leading him downstairs, were a de minimis use of force, insufficient to support a finding of a Fourth Amendment violation).

In the present case, Plaintiff Tinsley cannot show that any alleged injury was anything more than de minimis and therefore not actionable under § 1983. Plaintiff Tinsley has not listed any medical records or photographs or any injury in this Final Exhibit List (Doc. 17). In his Interrogatory Responses, Tinsley stated that he has not seen any medical personnel since December 1, 2007, so he did not seek or obtain any medical assistance with regard to the events of December 22, 2009. Attach. G, Interrogatory Responses of Tinsley, No. 18.

The Supreme Court has noted that "[n]ot every push or shove, even if it may later seem unnecessary in [the] peace of a judge's chambers, violates the Fourth Amendment."

Saucier v. Katz, 533 U.S. 194, 121 S. Ct. 2151, 2160, 150 L. Ed. 2d 272 (2001).  The right

to make an arrest or investigatory stop necessarily carries with it the right to use some degree

of physical coercion or threat to effect it.  Vondrake v. City of Las Cruces, 535 F.3d 1198,

1208 (10th Cir. 2008).

In Durruthy v. Pastor, 351 F.3d 1080, 1094 (11th Cir. 2003), the court noted that "the

application of de minimis force, without more, will not support a claim for excessive force

in violation of the Fourth Amendment."  The court in Durruthy also noted that the force used

to allegedly aggravate a preexisting shoulder injury was not sufficient because "[w]hat would

ordinarily be considered reasonable force does not become excessive force when the force

aggravated (however severely) a preexisting condition the extent of which was unknown at

the time."  Id. at 1094 n.10.  The court held that the force used by a female police officer in

order to affect the arrest of a television cameraman who walked into the middle of an

intersection while filming arrest protestors was de minimis force.  The officer allegedly

pulled the cameraman onto the ground, pinning his arms behind him and placing him in

handcuffs.  Id. at 1085.

In Nolin v. Isbell, 207 F.3d 1253 (11th Cir. 2000), the plaintiff alleged that while he

was engaged in horseplay, an officer saw what was going on, thought it was a fight, grabbed

the plaintiff from behind by the shoulder and wrist, threw him against a van three or four feet

away, kneed him in the back and pushed his head to the side of the van, searched his groin

area in an uncomfortable manner, and handcuffed him. The plaintiff contended he suffered

bruising to his forehead, chest, and wrist, although he admitted that the bruises disappeared

32

quickly and he did not seek medical treatment. The court held that in an excessive force case, the qualified immunity defense precludes liability unless a reasonable officer in the position of the defendant would have concluded that the use of force was unlawful. Id. at 1255. In Nolin, the court held that the use of force was de minimis, and the qualified immunity defense thus defeated the plaintiff's claim. Id. at 1258.

In Gross v. Pirtle, 245 F.3d 1151, 1158 (10th Cir. 2001), the court held that the deputies' alleged conduct in kicking a motorist's foot "very hard" during an arrest on a traffic charge was not excessive force under § 1983 and the deputy was entitled to qualified immunity. In Williams v. Bramer, 180 F.3d 699, clarified on reh'g, 186 F.3d 633 (5th Cir. 1999), the court held that an officer who choked plaintiff during a search of his mouth used de minimis force. See also Edwards v. Giles, 51 F.3d 155, 157 (8th Cir. 1995) (officer who threw plaintiff to the ground did not use excessive force, despite a cut to the stomach that the plaintiff sustained); Byrd v. Hopson, 265 F. Supp. 2d 594, 612-13 (W.D. N.C. 2003) (holding that deputy sheriffs' use of force during a search outside of a courtroom did not constitute anything more than a de minimis injury where the plaintiff did not present any medical records indicating she suffered any long-term or permanent physical injury). In Byrd, the testimony of a physical therapist was that the plaintiff did not suffer a permanent injury and should be able to regain full function of her leg.

For all these reasons, the officers are entitled to qualified immunity with regard to the seizure of Varner and Tinsley, and the force used upon Varner and Tinsley. The actions of the officers were objectively reasonable and did not violate any clearly established rights.

In <u>Doby v. DeCrescenzo</u>, 171 F.3d 858, 873-74 (3d Cir. 1999), the court held that police did not use excessive force when they placed a mentally ill individual into protective custody because police were aware of guns in the home, and the force used was applied in response to the individual's resistance to the officers.  Therefore, the defendants' actions were objectively reasonable, and they were entitled to qualified immunity.

Lastly, in her Complaint, ¶ 16, Plaintiff Varner alleges that unnamed "police . . . stepped on her oxygen hose until she began to suffer oxygen deprivation." Plaintiff's EMS and medical records do not show any such accusation, or that she suffered any injury because of this allegation.  Attachs. I and J.  Furthermore, in his Responses to Defendants First Requests for Admission, No. 8, Plaintiff Tinsley admits that he did not see an El Reno police officer step on Varner's oxygen hose at any time.  Attach. H.  And Defendant Officers state in their Declarations that they are unaware of any such action.  LCvR56.1(b) Statement, ¶ 45.

If this did occur, Plaintiff Varner fails to show how this harmed her, or whether this was anything other than an accident, which is not actionable under 42 U.S.C. § 1983. Defendant Officers are entitled to qualified immunity with regard to this issue as well.  To prevail in a § 1983 action, a plaintiff must establish (1) that she had a constitutionally protected right; (2) that she was deprived of that right; (3) that the defendant intentionally deprived her of that right; and (4) the officer acted under color of state law.  <u>Forrest v. Prine</u>, 620 F.3d 739, 743 (7th Cir. 2010).  In the present case, there is no showing that any police officer intentionally stepped on the oxygen tube of Plaintiff Varner.

Negligence does not state a claim under § 1983.  See <u>Daniels v. Williams</u>, 474 U.S.

34

327, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986). In <u>Daniels</u>, the Supreme Court held that an inmate who slipped on a pillow that was negligently left on stairs in a city jail could not bring a §1983 action for injuries incurred because of the fall. In <u>Davidson v. Cannon</u>, 474 U.S. 344, 106 S. Ct. 668, 88 L. Ed. 2d 677 (1986), the Supreme Court held that the protections of the Due Process Clause are not triggered by prison officials' failure to exercise due care. In that case, prison officials allegedly were negligent in failing to protect an inmate who was attacked after having sent a prison guard a note concerning a threat by another prisoner. There must be an intentional act by Defendants.

Even gross negligence is not sufficient to constitute a § 1983 claim. <u>See</u> <u>Harper v. Lawrence County</u>, 584 F.3d 1030, 1037 (11th Cir. 2009) (to establish deliberate indifference to a pretrial detainee's serious medical need under the Due Process Clause, the plaintiff must demonstrate that a defendant (1) had subjective knowledge of a risk of serious harm; (2) disregarded that risk; and (3) acted with more than gross negligence); <u>Jackson v. City of Joliet</u>, 715 F.2d 1200, 1206 (7th Cir. 1983) (holding that a city policeman's gross negligence in failing to save a person in a burning car, and in preventing other motorists from doing so, did not constitute a violation of § 1983).

Therefore, Defendant Officers are entitled to qualified immunity with regard to all actions concerning Plaintiff Varner and Plaintiff Tinsley as alleged in the First Cause of Action.

III.   **THERE IS NO LIABILITY AGAINST THE CITY OF EL RENO IN THIS CASE; THERE WAS NO UNDERLYING CONSTITUTIONAL VIOLATION BY ANY OF THE OFFICERS; FURTHERMORE, THE TRAINING OF THE OFFICERS WAS CERTAINLY CONSTITUTIONAL, AND THERE WAS NO UNCONSTITUTIONAL CUSTOM OR POLICY WITH REGARD TO ANY ALLEGED CONSTITUTIONAL VIOLATION, AND THERE WAS NO STATE LAW VIOLATION IN THIS CASE.**

In the Third Cause of Action in the Complaint (¶¶ 29-32), Plaintiffs allege that the City is liable for the alleged constitutional violations of the Defendant Officers, including an alleged lack of training. The LCvR56.1(b) Statement demonstrates that this is not true.

First, it is shown in Propositions I and II there was no underlying constitutional violation in this case by either Duran, Tinga or Sandberg. Therefore, for this reason alone the City of El Reno cannot be held liable in a 42 U.S.C. § 1983 case. City of Los Angeles v. Heller, 475 U.S. 796, 106 S. Ct. 1571, 89 L. Ed. 2d 806 (1986) (if officer acted constitutionally, city cannot be held liable); Trigalet v. City of Tulsa, 239 F.3d 1150 (10th Cir. 2001) (city could not be held liable under § 1983 in the absence of a constitutional violation by police officers; this is true even if city's policies, training, and supervision of other officers were unconstitutional).

Next, there was no unconstitutional policy of the City with regard to the seizures of the Plaintiffs and the deployment of the taser. The policy of the City regarding the use of the taser in this case, and the use of force, was constitutional. As was noted in Proposition I, all officers involved in the situation with Plaintiff Varner had taser certifications. And the use of the taser in this case was clearly based on a constitutionally sound policy of the City of El Reno Police Department. Attach. F, Sworn Expert Report of Edward M. Cangiano, at 7-10.

36

Therefore, there was no deficiency with regard to the training of Duran, Tinga, Sandberg or Gore, the officers who came to the scene in this case.  In Porro v. Barnes, 624 F.3d 1322, 1327 (10th Cir. 2010), the court held that a sheriff who was not present during the incident in which a stun gun was used on an immigration detainee while he was restrained was not liable under § 1983 in the detainee's excessive force claim.  In Porro, the court held that the county jail's policy of training jailers to use stun guns only if and when an inmate should become violent, combative, and pose a direct threat to the security of the staff, did not exhibit a deliberate indifference to the immigration detainee's due process rights against the use of excessive force, as required for § 1983 liability.  Id. at 1328-30.

A municipality can be held liable when a failure to train employees results in a constitutional violation.  In this case, the officers are well trained, as evidenced by their CLEET training, Taser certifications, as well as field training.  In order for liability to attach to a municipality, the failure to train must amount to deliberate indifference to the rights of persons with whom the police come into contact.  Walker v. City of Orem, 451 F.3d 1139, 1153 (10th Cir. 2006).  In City of Canton v. Harris, 489 U.S. 378, 391, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989), the Court held that for § 1983 liability to attach under a theory of inadequate training, "the identified deficiency in a city's training program must be closely related to the ultimate injury."

IV.    THERE NO WAS GENUINE ISSUE OF MATERIAL FACT WITH REGARD
       TO   ANY   ALLEGED   NEGLIGENT   INFLICTION   OF   EMOTIONAL
       DISTRESS IN THIS CASE.

In the Second Cause of Action, (¶¶ 27 & 28), Plaintiffs allege a claim for negligent and intentional infliction of emotional distress.  The LCvR56.1(b) Statement shows that nothing occurred in this case that constituted either of these claims.  The officers acted properly in attempting to prevent Plaintiff Varner from attempting to harm herself and others, and acted correctly in preventing Plaintiff Tinsley from interfering with them in this endeavor.

Oklahoma does not recognize negligent infliction of emotional distress as an independent tort.  Totty v. Independent School Dist. No. I-009 of Blaine County, Okla., 2008 WL 5070690, at *4 (W.D. Okla. 2008).  The court in Totty cited Kraszewski v. Baptist Med. Ctr. of Oklahoma, Inc., 1996 OK 141, 916 P.2d 241, 243 n. 1 in this regard.  The Totty court dismissed plaintiffs' negligent infliction of emotional distress claim.  See Lockhart v. Loosen, 1997 OK 103, 943 P.2d 1074, 1081 ("Under Oklahoma's jurisprudence the negligent causing  of emotional distress is not an independent tort, but is in effect the tort of negligence.").  Therefore, Plaintiff's negligent infliction of emotional distress claim must be analyzed as a negligence claim.  The  LCvR56.1(b) Statement shows that there was no actionable claim in this regard against any of the Defendants.

Furthermore, the LCvR56.1(b) Statement shows that Defendants did not commit the Oklahoma state law tort of intentional infliction of emotional distress.  Zeran v. Diamond Broadcasting, Inc., 203 F.3d 714, 721-22 (10th Cir. 2000) (holding that the evidence was

insufficient to overcome summary judgment in a diversity case involving Oklahoma law).

In Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555, 1558-59 (10th Cir. 1995), the employee alleged the employer's security personnel "committed assault and battery . . . when he threatened her physical safety, pushed her around and physically blocked her exit from his interrogation room."   The court in Starr held that this act was insufficient to constitute intentional infliction of emotional distress under Oklahoma law and granting of summary judgment to employer was upheld.  This was so even though the employee offered expert witness testimony diagnosing her as suffering from post-traumatic stress disorder. The court noted that "[n]othing short of 'extraordinary transgressions of the bounds of civility' will give rise to liability for intentional infliction of emotional distress." Id. at 1558. [Emphasis original].

In Buchanan v. Sherrill, 51 F.3d 227, 230 (10th Cir. 1995), summary judgment was granted in favor of employer was upheld regarding a state law claim of intentional infliction of emotional distress.  The court in Buchanan cited Beck v. Phillips Colleges, 1994 OK CIV APP 84, 883 P.2d 1283, 1286-87, where the court held that the test is whether a reasonable person could find the conduct so offensive "as to go beyond all possible bounds of decency, and to be regarded as outrageous, and utterly intolerable in a civilized society."  See also Merrick v. Northern Natural Gas Co., 911 F.2d 426, 433 (10th Cir. 1990) ("Insubordination, yelling, hostile reactions and the hurt feelings mutually accompanying such conduct do not give rise to a cause of action for intentional infliction of emotional distress.").  The court in Merrick held that summary judgment was properly granted to defendant. Id. 432-33.  The

court noted that the employee had argued that supervisor harshly criticized him, yelled at him, cussing at him on one occasion, and allowed another employee to switch offices with Plaintiff while Plaintiff was not in the office.  This was insufficient under Oklahoma state tort law.  See also Thompson v. State Farm Fire and Casualty Co., 34 F.3d 932, 942 (10th Cir. 1994) ("[M]ere unreasonableness of behavior will not suffice."  The defendant's conduct must be "'beyond all possible bounds of decency in the setting in which it occurred,'" or "'utterly intolerable in a civilized community.'").  And, for the reasons set forth in V, infra, Defendant officers cannot be sued under Oklahoma tort law because they were acting within the scope of their employment.  Okla. Stat. tit. 51, §§ 152.1; 153; and 163(c).

## V.   THE DEFENDANT OFFICERS DURAN, TINGA AND SANDBERG WERE ACTING WITHIN THE SCOPE OF THEIR EMPLOYMENT WITH THE CITY OF EL RENO; THEREFORE, THEY ARE IMMUNE FROM LIABILITY WITH REGARD TO ANY STATE LAW CLAIM.

With regard to the Second Cause of Action, Defendants Duran, Tinga and Sandberg cannot be held liable for any state law claim because they were acting within the scope of their employment.  The Oklahoma Governmental Tort Claims Act bars an action again a public employee who is acting within the scope of his employment.  Okla. Stat. tit. 51, §§ 152.1; 153; and 163(c).  The LCvR56.1(b) Statement demonstrates that Defendants were acting within the scope of their  employment with regard to the events of December 22, 2009.  See Rodebush v. Oklahoma Nursing Homes, Ltd., 1993 OK 160, 867 P.2d 1241, 1245 (nurse's aide at nursing home was acting within scope of employment when he slapped patient while bathing him; but court notes that as a general rule it is not within scope of

employment to commit an assault upon a third party); <u>Cooper v. Millwood Independent School District No. 37</u>, 1994 OK CIV APP 114, 887 P.2d 1370 (no tort action against school bus driver for failing to protect student from assault by other student "because 'scope of employment' claims against employees are prohibited by § 163(c) of the [Tort Claims] Act.").

## VI.   NO DEFENDANT COMMITTED ANY STATE LAW TORT OF DESTRUCTION OF PROPERTY OR OF FALSE ARREST AND IMPRISONMENT; AND IF THEY DID THE OFFICERS WERE IMMUNE UNDER STATE TORT LAW BECAUSE THEY WERE ACTING WITHIN THE SCOPE OF THEIR EMPLOYMENT.

With regard to another claim in Plaintiffs' Second Cause of action, see Complaint, ¶ 28, the LCvR56.1(b) Statement shows that Defendants, including the City of El Reno, did not commit the Oklahoma state law tort of what Plaintiffs call "destruction of property."  No officer destroyed or harmed any property of either Plaintiff.  Furthermore, there was no false arrest or imprisonment of either Plaintiff for the reasons stated above.  Probable cause clearly existed.

And, for the reasons set forth in V, <u>supra</u>, Defendant officers cannot be sued under Oklahoma tort law because they were acting within the scope of their employment with the City of El Reno.  Okla. Stat. tit. 51, §§ 152.1; 153; and 163(c).

## VII.   DEFENDANTS REQUEST THE COURT TO DECLINE TO EXERCISE ITS SUPPLEMENTAL JURISDICTION OVER PLAINTIFF'S STATE COURT CLAIMS.

With regard to the Plaintiffs' state law claims (Second Cause of Action), Complaint, ¶¶ 27-28, Defendants request the Court to exercise its discretion in the Defendants' favor,

41

and dismiss the pendent state claims as well.  See 28 U.S.C. § 1367(c); Guillickson v. Southwest Airlines Pilots' Association, 87 F.3d 1176, 1187 (10th Cir. 1996) (court has discretion to dismiss the state law claims).

## CONCLUSION

For the reasons stated, Defendants City of El Reno, Duran, Tinga and Sandberg respectfully request that summary judgment be granted in their favor.

Respectfully submitted,


 /s/ David W. Lee
David W. Lee, OBA # 5333
Emily B. Fagan, OBA # 22427

LEE LAW CENTER, P.C.
6011 N. Robinson Avenue
Oklahoma City, OK  73118-7425
(405) 848-1983/Fax: (405) 848-4978
Email address: leelawok@swbell.net

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that on January 3, 2011, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Brian M. Dell
Brian M. Dell, P.C.
501 N.W. 13th Street
Oklahoma City, OK  73103-2203

Roger D. Everett
508 W. Vandament, Suite 300
Yukon, OK  73099

/s/ David W. Lee
David W. Lee