# UNITED STATES DISTRICT COURT

for the

## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) LONA M. VARNER and<br>(2) LONNIE D. TINSLEY, | ) ) ) | |
| Plaintiffs, | ) ) | |
| Vs. | ) ) | Case No. CIV-2010-00636-F |
| (1) CITY OF EL RENO, OKLAHOMA,<br>(2) THOMAS DURAN,<br>(3) FRANK TINGA,<br>(4) JOSEPH SANDBERG, police officers,<br>and<br>(5) JOHN DOES NOS. 1 - 10, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

• ———————————————— • ————————————————

## PLAINTIFFS' RESPONSE AND BRIEF
## TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

• ———————————————— • ————————————————

Brian M. Dell
Brian M. Dell, P.C.
OKBA No. 2285; TXBA No. 24043436
501 N.W. 13th Street
Oklahoma City, OK  73103-2203
(405) 235-1115; fax (405) 235-1126
www.briandell-law.com
email:  bdell@briandell.com

-and-

Roger Everett
508 W Vandement, 3rd Fl
Yukon, OK
(405)350-0990
email:  rdelaw@juno.com
ATTORNEYS FOR THE PLAINTIFFS

## TABLE OF CONTENTS

Local Rule 56.1(c) Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

   I.   Force and excessive force by police . . . . . . . . . . . . . . . . . . . . . . 19
       tasering and battering violated
       the constitutional rights of the plaintiffs

   II.  Police had no cause for seizing . . . . . . . . . . . . . . . . . . . . . . . . 22
       and battering either plaintiff and
       are not entitled to qualified immunity

   III. El Reno's customs and policies encouraged police . . . . . . . . . . . . . . . 25
       to violate citizens' constitutional rights, and
       police negligence are subject to state law claims

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

## LIST OF ATTACHMENTS

Attachment A  -   Photo of Lona Varner's injuries

Attachment B  -   Lona Varner's Answers to Interrogatories

Attachment C  -   Lona Varner's Responses to Requests for Admissions

Attachment D  -   Excerpts to Lona Varner's deposition

Attachment E  -   Lonnie Tinsley's Answers to Interrogatories

Attachment F  -   Lonnie Tinsley's Responses to Requests for Admissions

Attachment G  -   Excerpts to Lonnnie Tinsley's deposition

Attachment H  -   David A. Dusenbury's *curriculum vitae* , materials reviewed, and
                    expert opinions - November 18, 2010

Attachment I  -    David A. Dusenbury's Supplemental Report - January 21, 2011

## TABLE OF AUTHORITIES

### Cases

*Breeden v. League Services Corp.*, . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
1978 OK 27, 575 P.2d 1374

*Bryan v. MacPherson*, ___ F.3d. ___, . . . . . . . . . . . . . . . . . . . . . . . . . 21
No. 08-55622 (9th Cir. Nov. 30, 2010).

*Casey v. City of Federal Heights*, . . . . . . . . . . . . . . . . . . . . . . . . . 20-23, 27
509 F.3d 1278 (10th Cir., 2007).

*Conn v. Gabbert*, . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
526 U.S. 286, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999),

*Gagnon v. Ball*, 696 F.2d 17 (2d Cir. 1982) . . . . . . . . . . . . . . . . . . . 22

*Gomes v. Wood*, 451 F.3d 1122, 1134 (10th Cir.2006) . . . . . . . . . . . . . . . 23

*Graham v. Connor*, . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22, 27
490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)

*Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, . . . . . . . . . . . . . . . 21, 23
53 L.Ed.2d 666 (2002)

*Kraszevski v. Baptist Medical Center of Oklahoma, Inc.*, . . . . . . . . . . . . . . 25
1996 OK 141, 916 P.2d 241

*Mick v. Brewer*, 76 F.3d 1127, 1136 (10th Cir.1996) . . . . . . . . . . . . . . . 23

*Monell v. Department of Social Services*, . . . . . . . . . . . . . . . . . . . . . 26
436 U.S. 658 (1978)

*O'Neill v. Krzeminski*, 839 F.2d 9 (2d Cir. 1988) . . . . . . . . . . . . . . . . . 22

*Pierce v. Gilchrist*, 359 F.3d 1279, (10th Cir.2004) . . . . . . . . . . . . . . . 22-23

*Russo v. City of Cincinnati*, 953 F.2d 1036 (6th Cir. 1992) . . . . . . . . . . . . . . . . 21

*Saucier v. Katz*, 533 U.S. 194, 207, . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

*Tennessee v. Garner*, 471 U.S. 1 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Zapico v. Bucyrus-Erie Co.*, 579 F.2d 714, (2d Cir. 1978) . . . . . . . . . . . . . . . 22

## Statutes

42 U.S.C. §1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Oklahoma Mental Health laws . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
Tit. 43A, Okl.Stats.

Oklahoma Governmental Tort Claims Act . . . . . . . . . . . . . . . . . . . . . . . 25-26
51 O.S. § 151, *et seq.*

## Learned Treatises

Restatement of Torts (Second), Sec. 46 (1965) . . . . . . . . . . . . . . . . . . . . . . 25

# UNITED STATES DISTRICT COURT
for the
## WESTERN DISTRICT OF OKLAHOMA

|  |  |  |
|---|---|---|
| (1) LONA M. VARNER and <br> (2) LONNIE D. TINSLEY, <br><br>       Plaintiffs, <br><br> Vs. <br><br> (1) CITY OF EL RENO, OKLAHOMA, <br> (2) THOMAS DURAN, <br> (3) FRANK TINGA, <br> (4) JOSEPH SANDBERG, police officers, <br> and <br> (5) JOHN DOES NOS. 1 - 10, <br><br>       Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | Case No. CIV-2010-00636-F |

## PLAINTIFFS' RESPONSE AND BRIEF
## TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

*Local Rule 56.1(c) Statement*

*Defendants' assertions controverted by plaintiffs*

The following numbered paragraphs are excerpted from the defendants' brief in support of its motion for summary judgment, the defendants Local Rule 56.1(b) statement. Each paragraph is recited verbatim; sentences within paragraph that appear to be assertions of fact are underscored, then controverted by the plaintiffs after the paragraph. Many of the paragraphs contain speculative comments by the defendants or hearsay. Factual claims were excised and controverted below.

    **8.**   . . . <u>Duran was advised by dispatch that it was an overdose and that there</u>

bmd

was a relative in the apartment with the suicidal subject.   .   .   .   Duran later learned

that the suicidal subject was Lona Varner and the relative who had advised of the situation

was Lonnie Tinsley, Ms. Varner's grandson.   .   .   .   Duran was only advised that she

was a suicidal subject who had taken an overdose of medication.   .   .   .

Controverted by

> REQUEST FOR ADMISSION NO. 2:  Admit that on December 22, 2009, you verbally threatened Defendants.

> RESPONSE:                Denied.  I told them to get out of my apartment, that they were not welcome there.

> REQUEST FOR ADMISSION NO. 3:  Admit that on December 22, 2009, you physically threatened Defendants.

> RESPONSE:                Denied.  Due to my physical condition, I am unlikely to be able to physically threaten anyone.

> REQUEST FOR ADMISSION NO. 4:  Admit that on December 22, 2009, you threatened to stab an El Reno Police Officer if he took the knife away from you.

> RESPONSE:                Denied.  No such conversation took place in my apartment.

> REQUEST FOR ADMISSION NO. 9: Admit that on December 22, 2009, you threatened to take your own life.

> RESPONSE:                Denied.  I have NEVER threatened to take my own life.

Attachment C; Attachment D, p. 23, ll. 21-22; p. 26, l. 23 - p. 27, l. 2; Attachment G, p.21. l. 14 - p. 22, l. 9; p. 36. ll. 1-3; p. 51, ll. 6-14.

> 10.   Upon arrival to Apartment No. 703, Mr. Tinsley met Duran at the front

door. .   .   .   Duran asked Mr. Tinsley where Ms. Varner was and Tinsley stated that she

<u>was inside. Mr. Tinsley stated that he believed that Ms. Varner would not want Duran in</u>

<u>there.</u> .   .   .

Controverted by

> **INTERROGATORY NO. 8:** Please describe in as complete detail as possible the factual basis on which you make the allegations contained in your Complaint. This includes, but is not limited to, actions and statements made by yourself, Lona M. Varner, named Defendants, and any employees of the City of El Reno.

> ANSWER:   I was called by my father, now deceased, to check on my grandmother, Lona Varner. I went to her apartment. She takes a lot of medication, but was unable to tell me what she had most recently taken. I felt like she wasn't making much sense, so I called 911 to request that EMTs come check her out. While standing at the foot of her bed, the apartment door was open and a policeman ran in. She told him to get out, she hadn't called him. They said they were going to tze her and I told them not to, that if they had some problem with the knife she was using to peel an orange, I would get the knife. They said they would taze me and I told them to go ahead, but don't taze her. But at least two of them pushed me into the hallway, dragged me down, causing me to hit me head and ear on the wheel of my grandmother's electric wheelchair. They handcuffed me and took me out and put me in the backseat of a police car. They finally let me out to go with my grandmother to the hospital.

> **INTERROGATORY NO. 10:** Identify the time, date, and substance of any oral statement or communication made by Defendants made in connection with any of the allegations you make in your Complaint.

> ANSWER:   See answer to No. 8 above. Those statements were made on December 22, 2010 around 6:30 in the evening.

Attachment E; and,

> **REQUEST FOR ADMISSION NO. 3:** Admit that you were outside of Lona M. Varner's apartment when the first El Reno Police Officer arrived on December 22, 2009.

> **RESPONSE:**              Denied.  I was inside her apartment at the foot of her

bed.

Attachment F; Attachment G, p. 29, ll. 1-16.

    **11.**    <u>As Duran entered, he heard Ms. Varner state, "Get out of here. I don't want</u>

<u>your help."</u>   .   .   . <u>Duran observed Ms. Varner reach for an object underneath her pillow</u>

<u>while stating, "Get the fuck out of here."</u>   .   .   .   <u>Duran observed Ms. Varner pull a</u>

<u>kitchen knife from under the pillow and grasp it in a fashion commonly used to stab or slash.</u>

<u>Ms. Varner looked at Duran and stated, "I want to die. I did not call you so get the fuck out</u>

<u>of my house."</u>

Controverted by

> **INTERROGATORY NO. 8**:  Please describe in as complete detail as possible the
> factual basis on which you make the allegations contained in your Complaint.  This
> includes, but is not limited to, actions and statements made by yourself, Lonnie D.
> Tinsley, named Defendants, and any employees of the City of El Reno.

> ANSWER:   See No. 6; also, the police were not called and were told to leave my
>                apartment by me.

> **INTERROGATORY NO. 9**:  Identify, with particularity, the facts surrounding any
> action or inaction taken by Defendants, which you believe is evidence of your alleged
> damages and/or injuries with regard to each claim listed in the Complaint.

> ANSWER:   The El Reno policemen came into my apartment without my permission
>                and shot me twice with a taser, causing several burns to my body, stood
>                on my oxygen line and cut the supply of oxygen to me off, leaving me
>                oxygen-deprived and fearful, torn the skin on my arms, handcuffed me
>                and directed tht I be sent to St. Anthony Hospital where I was kept for
>                six days, all of which, in addition to the pain and suffering, have left
>                me being charged for medical  treatments.

> **INTERROGATORY NO. 13** : Describe in as complete detail as possible all your
> actions and comments upon noticing the arrival of El Reno Police Officers on
> December 22, 2009.

ANSWER:   I was getting ready to slice an orange when a policeman burst into my apartment.  I told him to get out of my apartment, that he was not welcome and that I didn't call him.

INTERROGATORY NO. 16: Did you verbally threaten El Reno Police Officers at any time on December 22, 2009?  If your answer is yes, describe each verbal threat.

ANSWER:   No.

Attachment B; and,

REQUEST FOR ADMISSION NO. 2:  Admit that on December 22, 2009, you verbally threatened Defendants.

RESPONSE:            Denied.  I told them to get out of my apartment, that they were not welcome there.

REQUEST FOR ADMISSION NO. 3:  Admit that on December 22, 2009, you physically threatened Defendants.

RESPONSE:            Denied.  Due to my physical condition, I am unlikely to be able to physically threaten anyone.

REQUEST FOR ADMISSION NO. 4:  Admit that on December 22, 2009, you threatened to stab an El Reno Police Officer if he took the knife away from you.

RESPONSE:            Denied.  No such conversation took place in my apartment.

REQUEST FOR ADMISSION NO. 9:  Admit that on December 22, 2009, you threatened to take your own life.

RESPONSE:            Denied.  I have NEVER threatened to take my own life.

REQUEST FOR ADMISSION NO. 10:  Admit that on December 22, 2009, you used profanity towards the El Reno Police Officers.

RESPONSE:            Denied.  The only conscious recollection of anything I said when the police invaded my apartment that night was to tell them to leave and to request one of the emergency

medical technicians to prepare a breathing treatment for me, none of which involved profanity by me.

Attachment C; Attachment D, p. 35, ll. 9-22.

12.   Since part of Duran's job is to protect life and it was very clear that Ms. Varner did not want to live and was adamant about dying, Duran tried to reason with her. Duran noticed that Ms. Varner's actions surprised Mr. Tinsley, due to Mr. Tinsley saying, "I did not know she had that." Mr. Tinsley tried to have Ms. Varner give him the knife but she would not listen to her own grandson, Mr. Tinsley. Duran requested that he stay back from her, as it was a dangerous situation. Duran asked Ms. Varner numerous times with a calm voice to just place the knife down. Ms. Varner denied his requests and became more angry and aggressive. Duran was very surprised at how angry and aggressive she was. By the way Ms. Varner was holding herself and moving, Duran believed she had the physical capabilities to seriously harm someone with the deadly weapon that she possessed.

Controverted by
Attachment C, Nos. 3-4, 9, above; Attachment D, p. 27, ll. 7-16; p. 29, ll. 4-18; p. 32, ll. 23-25; p. 33, ll. 15-20; p. 51. ll. 10-18; p. 52, ll. 1-8; p. 53, ll. 1-11; p. 55, ll.1-22, p. 57, l. 17 - p. 58, l. 5; Attachment E, No. 8, above.

INTERROGATORY NO. 13: Were you concerned, at any point on December 22, 2009, that Lona M. Varner was suicidal?

ANSWER:   No.

Attachment E, No. 13; and,

REQUEST FOR ADMISSION NO. 6: Admit that an El Reno Police Officer instructed Lona M. Varner to put the knife down on December 22, 2009.

RESPONSE:              Unable to admit or deny. I did not hear any such

command, but I was being thrown to the floor in the
hallway by a couple of policemen.

Attachment F, No. 6; Attachment G, p. 21, l. 14 - p. 22, l. 9; p. 26, ll. 1-3; p. 51, ll. 6-14.

   **13.** . . . <u>Mr. Tinsley kept attempting to approach Ms. Varner in order to get</u>

<u>the knife. Duran had to tell him numerous times to back away and not approach her.</u> . .

Controverted by
Attachment C, No. 9, above; Attachment E, Nos. 8, 13 above; Attachment F, No. 6 above;
Attachment G, p. p. 33, l. 21 - p. 34, l. 3; p. 34, l. 19 - p. 35, l. 21.

   **14.** <u>Duran kept talking to Ms. Varner to try and calm her down, but nothing Duran</u>

<u>said seemed to work. Ms. Varner stated that if Duran tried to get the knife, she would stab</u>

<u>and kill Duran. Ms. Varner further stated, that she "killed four japs in World War II and</u>

<u>[she] would not bat an eye killing [him]." Duran took Ms. Varner's threats very seriously.</u>

<u>Duran was concerned for the safety of Mr. Tinsley, Ms. Varner and himself, so Duran</u>

<u>maintained his location and waited for additional officers to arrive.</u>

Controverted by
Attachment B, Nos. 8-9, 13, 16 above; Attachment C Nos. 2-4,9-10 above; Attachment D,
p. 46. ll. 13-18; p. 47, l. 25 - p. 48, l. 15; Attachment E, Nos. 8, 13 above; Attachment F,
No. 6, above; Attachment G, p. 48, l. 13 - p. 49, l. 17.

   **16.** <u>Upon arrival to Apartment No. 703, Tinga observed Officer Duran in the</u>

<u>doorway to the apartment. Officer Duran was ordering a subject inside, Ms. Varner, to drop</u>

<u>the knife. Tinga approached and looked inside the doorway. Tinga saw Ms. Varner sitting</u>

<u>up in a bed wielding what appeared to be a steak knife in her right hand. Ms. Varner was</u>

<u>holding the knife by the handle and was holding it in such a manner that would make it easy</u>

<u>for her to stab or thrust it into anyone that came within reach. She was pointing the blade</u>

in our direction. Ms. Varner was pumping the knife forward and backward and was telling

the officers to get back or she would kill them.

Controverted by
Attachment B, Nos. 13, 16 above; and,

> INTERROGATORY NO. 14: Describe in detail why you had a knife in your hand
> or hands during the time that El Reno Police Officers were at your apartment on
> December 22, 2009.

> ANSWER:   I was getting ready to slice the orange I had in my other hand.

> INTERROGATORY NO. 15: Describe in detail whether you complied with any or
> all El Reno Police Officer commands, requests or instructions on December 22,
> 2009.

> ANSWER:   I could not comply with the policeman's command that I drop the knife
>               because the initial shock from the first taser shot made it impossible for
>               me to open or close the hand with which I was holding the knife.

Attachment B; Attachment C, Nos. 3-4 above; Attachment D, p. 36, l. 25 - p. 37, l. 1; p.
37, ll. 14-16; p. 68, ll. 14-17.

17.   Tinga continued to order Ms. Varner to drop the knife while Tinga stepped

past Officer Duran and into the apartment. Tinga asked Ms. Varner to drop the knife. She

stated, "Fuck you, you come any closer, I'll cut ya." Tinga stepped back towards the middle

of the apartment.

Controverted by
Attachment B, Nos. 13-16 above; Attachment C, Nos. 3-4 above; Attachment D, above.

18.   Tinga noticed that a male was also in the residence, later learned to be Mr.

Tinsley. Mr. Tinsley, was pleading for the officers to do something and telling the officers

that his grandmother was suicidal. Mr. Tinsley also plead with Ms. Varner to drop the knife,

but also continually told the officers not to touch her or hurt her. Tinga explained to Mr.

Tinsley that he needed to step back and allow the officers to gain control of the situation. He

refused.

Controverted by
Attachment E, Nos. 8, 13 above; and,

> REQUEST FOR ADMISSION NO. 9:  Admit that you attempted to physically interfere with the El Reno Police Officers while they were at Lona M. Varner's apartment on December 22, 2009.

> RESPONSE:                Denied.  When I heard one of them tell another to taze her, I told them not to taze her.  Then they threw me on the floor.

Attachment E, No. 9; Attachment G, above, and, p. 35, l. 16 - p. 37, l. 8.

> 19.    Upon arrival at 1955 South Shepherd, Apartment No. 703, Sandberg entered

the residence. Sandberg observed an elderly white female, Ms. Varner, in a bed in the living

room. Sandberg observed that Ms. Varner was in an extremely agitated state. Varner had

a kitchen knife with a black handle and a pointed metal blade approximately six inches long.

Ms. Varner was yelling at Office Tinga, who had arrived prior to Tinga's arrival. Ms.

Varner was also swinging the knife around in an aggressive manner. Ms. Varner was stating

that she would not go to the hospital. Ms. Varner was making statements such as "Get the

fuck out of my house" and "Get the fuck away from me" while waiving the knife. Sandberg

observed the knife raised up above her shoulder in her hand, as if she was ready to use the

knife in a downward stabbing motion.

Controverted by
Attachment B, Nos. 8-9, 13-14, 16 above; attachment D, above.

INTERROGATORY NO. 10: Identify the time, date, and substance of any oral statement or communication made by Defendants made in connection with any of the allegations you make in your Complaint.

ANSWER:   One of them told me to drop the knife I was using to slice an orange and one said, "Taze her!"

Attachment B; and,
Attachment C, Nos. 2-5, 9-10 above; Attachment D, above, and p. 36, ll. 2-8; p. 37, ll. 14-16 & 20-24.

20.   <u>Upon arrival, Officer Gore observed Officer Duran in the doorway to the apartment. Gore observed Ms. Varner holding a knife and being belligerent. Gore heard the officers directing Ms. Varner to drop the knife. She did not comply with the request.</u>

Controverted by
Attachment B, Nos. 8-10, 13-16 above; and,
Attachment C, 2-4 above; and,

REQUEST FOR ADMISSION NO. 6:  Admit that on December 22, 2009, you did not put the knife down when initially instructed.

RESPONSE:                Denied.  The momentary electrical shock from the first taser shot left me unable to open of close my hands; I could not do anything.

Attachment C; Attachment D, above.

21.   .   .   .   <u>Ms. Varner again threatened the officers on scene verbally by threatening to use the knife on the them if the officers attempted to take it from her. Officers Sandberg and Tinga assisted Duran in trying to calm the situation and persuade Ms. Varner to put the knife down. However, Ms. Varner took a more aggressive posture on the bed and raised the knife above her head and stated, "If you come any closer, you're getting the knife."</u>

Controverted by
Attachment B, Nos. 8-10, 13-16 above; Attachment C, 2-4, 6 above, and Attachment D.

22.  Tinga continued to order Ms. Varner to drop the knife. She continually refused to drop the weapon and instead proceeded to directly threaten the lives of the officers. Tinga felt that if the officers were to get near her in an attempt to disarm her they would have been seriously injured by the edged weapon. .   .   .

Controverted by
Attachment B, Nos. 8-10, 13-16 above; Attachment C, 2-4, 6 above; amd Attachment D.

23.   .   .   .  Sandberg saw Mr. Tinsley assaulting Officer Tinga by pushing and shoving Officer Tinga from the rear. Officer Tinga could not reasonably face Mr. Tinsley while this was going on because Officer Tinga was facing Lona Varner, who had a knife in her hand. Officer Tinga was keeping himself between Ms. Varner and Mr. Tinsley and was protecting both himself and Mr. Tinsley by keeping both of them from the deadly threat.

Controverted by
Attachment E, Nos. 8-9; Attachment F, No. 9; and Attachment G, p. 31, ll. 16-23; p. 32, ll. 21-25; p. 35, ll. 3-11; p. 36, l. 16 - p. 37, l. 8.

24.   Officer Sandberg observed Officer Tinga continue to attempt to negotiate with Ms. Varner, but with no success. Ms. Varner continued yelling at the officers that she would cut them and kill them. It appeared that Ms. Varner was serious in her threats and would harm the officers if they were close enough. The officers had exhausted attempts at verbally getting Ms. Varner to comply. Officer Tinga told Officer Duran to "Taze her," as an attempt to disarm Ms. Varner, who was still brandishing the knife. Officer Duran warned Ms. Varner to drop the knife or he would use his Taser. Ms. Varner did not drop the knife.

<u>Officer Duran drew and deployed his Taser.</u>

Controverted by
Attachment B, Nos. 8-10, 13-16 above; Attachment C, Nos. 2-4 above; and,

> REQUEST FOR ADMISSION NO. 6:  Admit that on December 22, 2009, you did not put the knife down when initially instructed.

>> RESPONSE:                Denied.  The momentary electrical shock from the first taser shot left me unable to open of close my hands; I could not do anything.

> REQUEST FOR ADMISSION NO. 7:  Admit that on December 22, 2009, you were informed that if you did not put the knife down, a taser may be used.

>> RESPONSE:                Denied.  I heard no one say anything about why they were tasering me.

> REQUEST FOR ADMISSION NO. 8:  Admit that on December 22, 2009, you did not comply with commands to put the knife down.

>> RESPONSE:                Denied.  See No. 6 above.

Attachment C, Nos. 6-8; Attachment D, above, and p. 42, ll. 1-12; p. 43, ll. 8-24.

   25.    . . . <u>Tinga felt this was the best option to disarm Ms. Varner, since she had refused the verbal commands to drop the knife. Ms. Varner was in the process of standing up when Duran un-holstered his Taser.</u> . . .    <u>Since both prongs did not strike Ms. Varner, the Taser was ineffective and did not affect Ms. Varner.</u> . . .

Controverted by
Attachment B, Nos. 8-10, 13-16 above; Attachment C, Nos. 2-4, 6-8 above; Attachment D, p. 36, ll. 2-8; p. 37, ll. 20-24.

   26.   <u>When Tinga looked at Officer Duran and told him to tase Ms. Varner, Mr. Tinsley, became aggravated and started pushing Tinga and telling Tinga not to tase her. Mr.</u>

<u>Tinsley was aggressive and Tinga told Tinsley to stay back. Tinsley refused and continued</u>

<u>to push against Tinga, in what Tinga perceived to be an effort to get by Tinga. Tinga pushed</u>

<u>Mr. Tinsley back and told him several times to stop his actions. Tinsley continued to refuse</u>

<u>Tinga's verbal commands and attempted to push against Tinga again. Sandberg saw Tinsley</u>

<u>began a full-force assault on Officer Tinga. Officer Gore and Tinga pushed Tinsley back and</u>

<u>took him to the ground.</u>

Controverted by
Attachment B, Nos. 8-10, 13-16 above; Attachment C, Nos. 2-4, 6-8 above; Attachment E, Nos. 8-9 above; and,

> **INTERROGATORY NO. 18**: Are you seeking **damages for any physical injury or harm** allegedly suffered due to any action or inaction of Defendants? **IF YOUR ANSWER IS YES**, please identify on whose behalf you are seeking such damages and for each person you identify, identify the name and address of **each** health care provider (physician, physician's assistant, nurse, medical clinic or center, etc.) from whom the person(s) you identify sought and/or received **any** medical care/treatment from December 1, 2007 to the present.

> ANSWER:   The police banged me head and left ear on the wheel of the electric wheelchair when they threw me down. My ear bled. They would not let the EMT standing there treat me. I received no treatment. I have not seen any doctors since December 1, 2007.

Attachment E; Attachment F, No. 6 above; Attachment G, p. 49, ll. 9-29; and,

> **INTERROGATORY NO. 7**: As a result of the allegations referred to in your Complaint, set forth in detail the nature of the injuries you allegedly sustained, giving the medical terms thereof, if known, and the part or parts of the body affected, and give a detailed calculation of the damages that the Plaintiff is claiming and how that was calculated.

> ANSWER:   My head and left ear; see response to No. 6 above.

> **INTERROGATORY NO. 8**: Please describe in as complete detail as possible the factual basis on which you make the allegations contained in your Complaint. This

bmd

includes, but is not limited to, actions and statements made by yourself, Lona M. Varner, named Defendants, and any employees of the City of El Reno.

ANSWER:   I was called by my father, now deceased, to check on my grandmother, Lona Varner. I went to her apartment. She takes a lot of medication, but was unable to tell me what she had most recently taken. I felt like she wasn't making much sense, so I called 911 to request that EMTs come check her out. While standing at the foot of her bed, the apartment door was open and a policeman ran in. She told him to get out, she hadn't called him. They said they were going to taze her and I told them not to, that if they had some problem with the knife she was using to peel an orange, I would get the knife. They said they would taze me and I told them to go ahead, but don't taze her. But at least two of them pushed me into the hallway, dragged me down, causing me to hit me head and ear on the wheel of my grandmother's electric wheelchair. They handcuffed me and took me out and put me in the backseat of a police car. They finally let me out to go with my grandmother
to the hospital.

Attachment F.

27.   Ms. Varner stared at Duran and continued to hold the knife up in an aggressive manner. . .   . Officer Sandberg then utilized his Taser, with both prongs making contact, which rendered Ms. Varner incapable of further aggressive action with the knife. The use of the Taser was necessary due to Ms. Varner's refusal to comply with repeated orders to drop the knife and her continued verbal threats.

Controverted by
Attachment B, Nos. 8-10, 13-16 above; Attachment C, Nos. 2-4, 6-8 above; Attachment D, p. 42, ll. 1-12; p. 43, ll. 8-24; and, Attachment H - Dusenbury Report.

28.   Sandberg observed Ms. Varner's body lock up as expected. The Taser cycled for its normal five seconds. When the cycle completed, Ms. Varner looked right at Sandberg and said, "You mother fucker!" and she started to rise from the bed with the knife still in

an above the shoulder ready to stab position. Sandberg cycled the Taser again and Officer

Duran attempted to take the knife from Ms. Varner while she was under the effects of the

Taser.  Sandberg had to cycle the Taser once more while Officer Duran removed the knife

from Ms. Varner's hand and Officer Tinga assisted.

Controverted by
Attachment B, Nos. 8-10, 13-16 above; Attachment C, Nos. 2-4, 6-8 above; Attachment D,
above; and, Attachment H - Dusenbury Report.

    **29**.    .   .Ms. Varner continued to yell and curse that she was going to kill them.
While controlling Ms. Varner's arm, she received a laceration. .   .   .

Controverted by
Attachment B, Nos. 8-10, 13-16 above; Attachment C, Nos. 2-4, 6-8 above; Attachment D,
above

    **30**.   .   .   .   Mr. Tinsley was struggling the entire time. .   .   .

Controverted by
Attachment E, Nos. 8-9, 18 above; Attachment F, Nos. 6-8 above; Attachment G, p. 35,
l. 16 - p. 37, l. 8.

    **31**.   .   .   . Mr. Tinsley was detained due to his obstruction of police officers and

because he was assaulting an officer. .   .   .   .    Mr. Tinsley thanked Officer Gore and

stated that he understood. Sandberg also explained to Mr. Tinsley why the actions were

necessary and Tinsley made short statements to Sandberg about how he understood and was

sorry for his actions.

Controverted by
Attachment E, Nos. 8-9, 18 above; Attachment F, Nos. 6-8 above; Attachment G, above,
plus p. 39, ll. 15-21; p. 40, ll. 4-9.

    **32**.    Mr. Tinsley did not appear injured in any way and the officers did not hear

Tinsley complain to anyone that he was injured. Tinsley never asked for medical treatment.

Controverted by
Attachment E, Nos. 7-9, 18 above; Attachment F, Nos. 6-8 above; Attachment G, p. 41, ll. 9-25.

34.   .  .  .   Ms. Varner told Parkview EMS that she was going to stab Duran if

Duran had approached any closer to her.  .  .  .

Controverted by
Attachment B, Nos. 10, 13-14, 16 above; Attachment C, Nos 2-4, 10 above; Attachment D, p. 46, ll. 13-18; p. 47, l. 25 - p. 48, l. 15; Attachment G, p. 48, l. 13 - p. 49, l. 17.

35.   .  .  .      While at the hospital, Parkview EMS told Duran that while

transporting Mr. Varner, she continued to make several statements about killing Duran and

other police officers.

Hearsay.  Controverted by
Attachment B, Nos. 10, 13-14, 16 above; Attachment C, Nos 2-4, 10 above; Attachment D, above.

36.   While Duran was at Parkview Hospital, Ms. Varner made several statements

about killing the police. She told Duran that she was going to kill every officer that was in

her apartment when she got out. Ms. Varner further stated that she was going to snap

Duran's neck like a twig, just like she did during World War II.

Controverted by
Attachment B, Nos. 8-9, 13,16, above; Attachment C, No. 2-4, 9-10, above; Attachment D, above; Attachment E, Nos. 8, 13 above; Attachment F, No. 6 above; Attachment G, above.

37.   .  .  .   Duran believed that Ms. Varner was an obvious threat to herself and

to others due to her actions that night.   .   .   .

Controverted by
Attachment B, Nos. 8-9, 13,16, above; Attachment C, No. 2-4, 9-10, above; Attachment D, above.

38.   Due to the deployment of a Taser device, Duran completed a Use of Force

Report.   .   .   .

Controverted by
Attachment I, Dusenbury Suppl. Report, pg. 4, No. 4 - pg. 6, No. 13.

39.   Duran had considered using his can of First Defense OC spray; however, due

to the confined space and the longer lasting effects of OC spray, Duran did not believe it

would be a good option in the situation. .   .   .

Controverted by
Attachment I, Dusenbury Suppl. Report, pg. 4, No. 4 - pg. 6, No. 13.

42.   Duran, Tinga, Sandberg and Gore did not use any excessive force against or

upon Ms. Varner or Mr. Tinsley at any time during the incident on December 22, 2009.

They used only the force necessary to react to Ms. Varner's threatening words and actions

and her refusal to comply with directions to drop the knife. They used only the force

necessary to control of Mr. Tinsley, as he was obstructing the officers' duties and was

pushing and shoving Officer Tinga.   .   .   .

Controverted by
Attachment A; Attachment B, Nos. 8-10, 13-16 above; Attachment C, Nos. 2-10 above;
Attachment D, p. 58. l. 22 - p. 59. l. 25; p. 60, ll. 18-22; ; Attachment E, Nos.8-9, 18
above; Attachment F, Nos. 6-8 above; Attachment G;  Attachment I, Dusenbury Suppl. Rpt.

43.   Duran, Tinga, Sandberg and Gore did not unlawfully detain or seize either

Plaintiff Varner or Plaintiff Tinsley at any time during the incident on December 22, 2009.

.   .   .

Controverted by
Attachments A, B, C, D, E, F, G, H and I.

44.   None of the Defendants in this case did anything that constituted a state law

tort, or false arrest or imprisonment or negligent or intentional infliction of emotional

distress or destruction of property with regard to violated any of Plaintiff Varner or Plaintiff

Tinsley.  .   .   .

Controverted by
Attachment A; Attachment B, Nos. 8-10, 13-16 above; Attachment C, Nos. 2-10 above;
Attacchment D; Attachment E, Nos.8-9, 18 above; Attachment F, Nos. 6-8 above;
Attachment G; Attachment I, Dusenbury Suppl. Rpt.

45.   None of the officers stepped on Ms. Varner's oxygen hose. None of the

officers engaged in any illegal or improper destruction of Ms. Varner's property.   .   .   .

Controverted by
Attachment B, Nos. 8-10, 13-16 above; Attachment C, Nos. 2-10 above; Attachment D, p.
38, l. 3-25; p. 41, l. 6-25; Attachment E, Nos.8-9, 18 above; Attachment F, Nos. 6-8
above; Attachment I, Dusenbury Suppl. Rpt.

46.   All of the officers who were at the scene were properly trained by the City of

El Reno with regard to all aspects of the events involving Plaintiffs on December 22, 2009.

.   .   . Controverted by
Attachment H and I, Dusenbury Report and Suppl. Report.

47.   There were no unconstitutional policies of the City of El Reno that were the

cause of any alleged constitutional or state law claims by Plaintiffs in this case.   .   .   .

Controverted by

Attachment B, Nos. 8-10, 13-16 above; Attachment C, Nos. 2-10 above; Attachment D, above; Attachment E, Nos.8-9, 18 above; Attachment F, Nos. 6-8 above; Attachment G, above; Attachments H and I, Dusenbury Report and Suppl. Rpt.

*Argument and Authorities*

I.   FORCE AND EXCESSIVE FORCE BY POLICE
     TASERING AND BATTERING VIOLATED
     THE CONSTITUTIONAL RIGHTS OF THE PLAINTIFFS

The El Reno police entered the apartment of Lona Varner after her grandson, Lonnie Tinsley, called 9-1-1 and requested EMTs and an ambulance to check on his grandmother because he could not tell him how many pills she had taken.  Lona Varner, 86 years-old at the time of this incident, suffers from a variety of ailments including chronic obstructive pulmonary disease (COPD), injuries to her neck and vertebrae and takes a lot of prescribed medications.  She generally stays in her hospital-type bed in the living room of her little apartment, tethered to an oxygen bottle with a hose long enough that she can slowly make it to the kitchen or to her electric cart.

Factual questions arise comparing the statements of the plaintiffs and the defendants.  There are questions for the triers of fact to determine.  Although police often must make split-second decisions, the circumstances here put to the test of objective reasonableness whether the police had authority to immediately enter Lona Varner's apartment, or taze her upon their suggestion that she was suicidal, overdosed on medication, or presented a threat to them because she had a knife and if that was a threat, or why they thought an 86 year-old woman on oxygen in a hospital bed was a threat.  Was force necessary?  Was it objectively

reasonable?

There are similarities in the instant case and *Casey v. City of Federal Heights*, 509 F.3d 1278 (10th Cir., 2007). Casey was taking a file to the clerk's counter when a police officer confronted him and immediately used an M26 Taser. She never told him he was under arrest or to quit struggling during the three plus tasings. The court noted that to determine whether the force used in a particular case is excessive "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)." This determination "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396, 109 S.Ct. 1865.   *Casey, Id.* at 1281.

The court noted that Casey's crime, if a crime at all, was not a severe crime. Had he been allowed to return the file, government operations would not have been impaired. *Casey, Id.* The question in the present case would be what crime had Lona Varner committed when the police burst into her apartment? They were confronted by an old woman laying in a hospital bed in her livingroom, clearly hooked up to oxygen. They report they had been told she had taken pills. They made no inquiry to her or her grandson about her present condition and immediately tazed her. Their claims of her aggression do not sound like an old woman overdosing on medication.

The argument that the El Reno police were following the use of force manual because they went up the "Levels of Force" from 1 to 2 to 3, *et cetera*, fails when the police had no authority to invade the apartment, use force, or taser an old woman in her bed. As noted in *Casey*, qualified immunity will not be accorded police where the force is excessive and not reasonable. *Casey, supra.*, at 1284.

The defendants also argue that the use of a taser is a relatively new technique and that the use has not been clearly established, citing *Bryan v. MacPherson*, ___ F.3d. ___, No. 08-55622 (9ᵗʰ Cir. Nov. 30, 2010). This decision appears to be contrary to the Tenth Circuit's holding in *Casey, supra*, 509 F.3d 1278 (10ᵗʰ Cir., 2007). In *Casey*, the court cited *Saucier v. Katz*, 533 U.S. 194, 207, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), stating "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 202, 121 S.Ct. 2151. Additionally, the court stated "the Supreme Court has warned that 'officials can still be on notice that their conduct violates established law even in novel factual circumstances.' *Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)." *Casey, Id.*, at 1284.

Nor is the incident here a parallel of the facts cited by defendants in *Russo v. City of Cincinnati*, 953 F.2d 1036 (6ᵗʰ Cir. 1992). Also, the defendants' version of what happened is disputed by the plaintiffs here.

The police were clearly acting under color of law. Intentionally or recklessly, they injured the plaintiffs physically, as well as detaining them, through acts the plaintiffs contend

were both unnecessary and unreasonable, in violation of their constitutional rights under the Fourth and Fourteenth Amendments and the laws of the State of Oklahoma. Police who were present and did nothing to stop those that committed the acts are liable because of their affirmative duty to enforce the law and preserve the peace. *Gagnon v. Ball*, 696 F.2d 17 (2d Cir. 1982); *Zapico v. Bucyrus-Erie Co.*, 579 F.2d 714, 718 (2d Cir. 1978); *O'Neill v. Krzeminski*, 839 F.2d 9 (2d Cir. 1988).

The Tenth Circuit states that it has adopted a sliding scale to determine when law is clearly established. "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Casey, supra*, 509 F.3d 1278, 1280, citing *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir.2004).

As noted by the statements of the plaintiffs contained in their responses to defendants interrogatories and requests for admission above, and by the main and supplemental report of the plaintiffs' expert on police practices, David A. Dusenbury, virtually every action by the police in Lona Varner's apartment resulted in both the use of force and an excessive use of force, resulting in violations of the Fourth and Fourteenth Amendments to the U.S. Constitution. *Tennessee v. Garner*, 471 U.S. 1 (1985); *Graham v. Connor, supra*.

## II.   POLICE HAD NO CAUSE FOR SEIZING AND BATTERING EITHER PLAINTIFF AND ARE NOT ENTITLED TO QUALIFIED IMMUNITY

The police kept out the EMTs and entered Lona Varner's apartment without her or her grandson's permission. She was laying in her bed with the head part raised starting to

peel an orange clearly recovered from her confusion about what medication she had taken. The first policeman in tasered her, causing an initial shock which partially paralyzed her. The orange fell to the floor. One of the taser darts disengaged, breaking the circuit. A second policeman entered the apartment and fired another taser at Mrs. Varner which struck her and stuck just below her neck on her breast bone. That policemen stated he "pulsed" the taser three times, three to five seconds each taze. Mrs. Varner suffered large burns on her chest in addition to being terrorized by the police actions. Attachment A. The police grabbed her arms, tearing her old skin, handcuffing her and then allowing the EMTs to take her to the hospital. They then had her transferred to St. Anthony's mental ward, where she remained for six days.

The *Hope, supra*, decision "shifted the qualified immunity analysis from a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional." *Gomes v. Wood*, 451 F.3d 1122, 1134 (10th Cir.2006) (quoting *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir.2004)).

A law enforcement official who fails to intervene to prevent another law enforcement official's use of excessive force may be liable under § 1983. *Casey, supra,* at 1283, citing *Mick v. Brewer*, 76 F.3d 1127, 1136 (10th Cir.1996). In *Mick*, a police officer was accused of pulling the defendant out of her car, throwing her to the pavement, stepping on her, and dragging her across the ground, in violation of the Fourth Amendment. The court held that a Secret Service agent who was present could be constitutionally liable for his failure to

bmd

— 23 —

intervene if he "watched the incident and did nothing to prevent it. Id. at 1137."

The El Reno police use the Oklahoma Mental Health laws (Tit. 43A, Okl.Stats.), as their pretext for tazing Lona Varner. The grandson called 9-1-1 because he was concerned that his grandmother could not tell him how many pills she had taken. The police burst into a darkened room and, without inquiry, taze the old woman when she tells the intruders to get out. The police acted as though they were obligated to act as they did and to not assess the situation, which clearly did not require a "split-second" determination to use force.

While the foregoing was going on, the police threw Mrs. Varner's grandson, Lonnie Tinsley to the floor, causing him to strike his head on Mrs. Varner's electric cart as he fell, and his ear bled. Did Tinsley commit a crime by telling the police, "Don't taze my Granny"? He was handcuffed and placed in the back of a police bar, but eventually released. In addition to his head injury, being battered by the police and detained, Mr. Tinsley was emotionally distraught at the sight of the police tazing his grandmother.

The police also argue their "collective knowledge" authorized them to enter and taze Lona Varner, on the grounds she had taken "a large volume of pills." The Parkview home health person stated Varner had taken twelve (12) pills, and then responded that Varner suffered from a variety of ailments and took about a dozen different kinds of pills. Nothing in the call from the grandson nor the home health person implied violence. The defendants repeat that Lonnie Tinsley's 9-1-1 call wherein he says that his grandmother says her life is over and she wants to end it and that she's taken some medicine and that she has a DNR. No threats. Even the dispatcher told the police there were no weapons. Even with

collective knowledge, the police were unobservant and quick on the draw.

The defendants argues Tinsley has no basis to complain of anything that happened to

Varner, citing *Conn v. Gabbert*, 526 U.S. 286, 292, 119 S.Ct. 1292, 143 L.Ed.2d 399

(1999), somehow relating this case to a lawyer's complaint of his client's denial of rights to

counsel.  Tinsley saw the police start to taze his grandmother, a relative who suffered burns

and torn skin, oxygen deprivation and handcuffing, all the while in her hospital bed.  All of

which are a causes of action in Oklahoma for intentional and negligent infliction of

emotional distress.  Restatement of Torts (Second), Sec. 46 (1965);    *Breeden v. League*

*Services Corp.*, 1978 OK 27, 575 P.2d 1374, 1376; *Kraszevski v. Baptist Medical Center*

*of Oklahoma, Inc.*, 1996 OK 141, 916 P.2d 241, 250.

As for Tinsley's complaint of physical injury, his testimony is that he did nothing

more than tell them not to taze his grandmother.  Force used on him would be not be

objectively reasonable.  He testified his ear bled and that police would not let the EMT treat

him.  As such the force resulting in the injury was a violation of Tinsley's Fourth and

Fourteenth Amendment rights, as well as assault and battery under the Oklahoma Criminal

Statutes, preventing the police from invoking immunity.

III.    EL RENO'S CUSTOMS AND POLICIES ENCOURAGED POLICE
        TO VIOLATE CITIZENS' CONSTITUTIONAL RIGHTS, AND
        POLICE NEGLIGENCE ARE SUBJECT TO STATE LAW CLAIMS

The  foregoing  section contains argument and authorities for state claims for

intentional and negligent infliction of emotional distress and for assault and battery.   Tort

claims were filed with the City of El Reno pursuant to the Oklahoma Governmental Tort

Claims Act., 51 O.S. § 151, *et seq.*

In November, 2008, more than a year before the instant case, El Reno police tasered a driver who was in sever diabetic shock, and handcuffed him.  The Chief of Police later said the police thought the driver was drunk and resisting arrest.  In the hubbub following that incident, CLEET noted that police are to be trained in dealing with types 1 and 2 diabetics, pursuant to state law.

That incident served as notice, however, to police regarding the use of tasers.  Among the tests under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), are that claims may be premised on (1) an officially promulgated policy; (2) a custom or persistent practice; (3) deliberately indifferent training or supervision that is the proximate cause of the violation of the plaintiffs' rights; or, (4) a single decision by an official with decision making authority.  The instant claims are premised on "(2) a custom or persistent practice," and "(3) deliberately indifferent training or supervision that is the proximate cause of the violation of the plaintiffs' rights."

The police have argued that they were certified in the use of tasers and that they were merely following the El Reno Department Use of Force Manual.  The claims by the competing experts shows substantial dispute between the quality and efficacy of the training of the police involved, the following of the use of force manual by those using tasers, and the deliberate indifference by the attending police who did not stop the improper use of the tasers.  The foreknowledge of the diabetic tazing shows that a custom or persistent practice involving the wanton use of tasers exists in the El Reno police department and/or that the

bmd

department is deliberately indifference to training or supervision to stop the problem.

The plaintiffs has argued in a previous section as to why the defendant police are not entitled to qualified immunity for their actions in this incident.  The deployment of the M26 Taser by police against Lona Varner, and the failure of the non-tazing police to stop it, excludes their claims for qualified immunity and the City's claim for non-liability for the actions of its police, long after notice and opportunity to remedy.  *Casey, supra.*, 509 F.3d 1278, 1287 (10th Cir., 2007); *Graham, supra*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

## Conclusion

Every fact material to the defense and as recited in their motion for summary judgment is disputed by the testimony of the plaintiffs in their responses herein, or by David Dusenbury, plaintiffs' expert, in his report and supplement.  The triers of fact must determine what happened in this case and the statements of the plaintiffs and the defendants are totally at odds.

Under the plaintiffs recited facts, the actions of the police were violations of the plaintiffs Fourth and Fourteenth Amendment rights.  The plaintiffs has recited facts that make the police liable for state claims, as well as citing examples of customs and persistent acts and deliberate indifference to the rights of the plaintiffs for which the City of El Reno is liable.

The plaintiffs respectfully request the court deny the defendants' motion for summary judgment and allow the matter to proceed on to trial on all issues.

bmd

Respectfully submitted,

/s/ Brian M. Dell
Brian M. Dell
Brian M. Dell, P.C.
OKBA No. 2285; TXBA No. 24043436
501 N.W. 13th Street
Oklahoma City, OK  73103-2203
(405) 235-1115; fax (405) 235-1126
www.briandell-law.com
email:  bdell@briandell.com

-and-

/s/ Roger Everett

Roger Everett
508 W Vandement, 3rd Fl
Yukon, OK
(405)350-0990
email:  rdelaw@juno.com

ATTORNEYS FOR THE PLAINTIFFS

CERTIFICATE OF SERVICE

I hereby certify that on February 4, 2011, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

David Lee
Emily B. Fagan

/s/ Brian M. Dell

Brian M. Dell